UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____     :
                                    :
Saleem Bey,                         :     Civil Action No. _____
                                    :
                Petitioner          :
                                    :
          v.                        :
                                    :
Louis Folino, Superintendent of the :
State Correctional Institution at Greene, :
                                    :
                Respondent.         :
_____     :

**PETITION FOR A WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. § 2254
AND
CONSOLIDATED INITIAL MEMORANDUM OF LAW**

Michael Wiseman, Esq.
Post Office Box 120
Swarthmore, Pennsylvania 19081
215-450-0903
Wiseman_Law@Comcast.Net
Counsel for Petitioner


Dated:      Swarthmore, Pennsylvania
            October 4, 2013

## PRELIMINARY STATEMENT

Petitioner, Saleem Bey, who is serving a sentence of life without parole resulting from his conviction for murder in the first degree and related charges hereby petitions for habeas corpus relief.

Pursuant to Local Rule 9.3, Petitioner also submits the form required to accompany a petition for writ of habeas corpus.

Transcripts of the state court proceedings ("Notes of Testimony") will be cited as "NT" followed by the date of the proceeding and page and line citations.

The Pennsylvania Superior Court issued two unpublished opinions relevant to this *Petition*: *Commonwealth v. Bey*, 1864 EDA 2006 (Pa.Super. May 12, 2008) (direct appeal opinion); *Commonwealth v. Bey*, 771 EDA 2011 (Pa.Super. June 1, 2012 (post-conviction opinion). They will be cited as *Bey 1* and *Bey 2*, respectively.

The state trial court issued a post-conviction opinion relevant to the issues in this *Petition*. *Commonwealth v. Bey*, CP-51-CR-1206691-2001, CP-51-CR-1209051-2001 (CCP Phila. July 26, 2011). It will be cited as *TCO* followed by a page reference to the slip opinion.

All emphasis is added unless otherwise indicated. Parallel citations are omitted. All other citations are self-explanatory or are explained.

i

TABLE OF CONTENTS

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

This Petition is Timely Under the Anti Terrorism
and Effective Death Penalty Act (AEDPA) . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement Regarding Exhaustion and Default . . . . . . . . . . . . . . . . . . . . . . . 4

Allegations Regarding the AEDPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Grounds for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Ground I
      Due to a Combination of Prosecutorial Misconduct, Court Error and
      Ineffective Assistance of Trial and Appellate Counsel, Petitioner's Trial
      Was Awash in Improper and Highly Prejudicial Evidence of Threats and
      Unrelated Murders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.     Kenneth Thompkins' Testimony and Use of Prior Statements . . . . . 7

             1.    The December 2005 Meeting . . . . . . . . . . . . . . . . . . . . . . . . . 9
             2.    The January 2005 Meeting . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      B.     Other Evidence of Irrelevant and Highly Prejudicial Violence . . . . 12

             1.    The Secret Motive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
             2.    Thompkins' Alleged Fear . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
             3.    Reference to the Victims' Ties to Violence . . . . . . . . . . . . . . 14

      C.     Evidence of Other Murders and Kenneth Thompkins' Fear Was
             Improperly Admitted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

1.     The Evidence was Irrelevant . . . . . . . . . . . . . . . . . . . . . . . . 15

2.     The Evidence Was Inadmissible to Prove Why Thompkins Made a Prior Inconsistent Statement Because Such Evidence Was Hearsay and Far More Prejudicial than Probative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    a.     Hearsay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    b.     Prejudice Far Out-Weighed Probative Value . . . . . . . 20

    c.     This Prohibited "Evidence" and Comments About It Were Introduced in Violation of the Trial Court's Evidentiary Rulings . . . . . . . . . . . . . . . . . . . . . . . . . 23

    d.     Curative Instructions . . . . . . . . . . . . . . . . . . . . . . . . . 25

D.     The Constitutional Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

1.     Prosecutorial Misconduct . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

2.     Trial Counsel Failure to Object to Some Aspects of the Evidence, Argument and Comments was Ineffective . . . . . . 31

3.     The Constitutional Errors – Prosecutorial Misconduct and Ineffective Assistance of Counsel – Were Prejudicial as the Evidence was Far from Overwhelming. The State Court's Conclusion to the Contrary was Unreasonable Based Upon the Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    a.     Officer Taylor's Eyewitness Testimony was Inconsistent with His Earlier Testimony and Statements, that of Other Officers and with the Physical Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    b.     The Jury's Two Requests for a Readback of the Identification Testimony Also Shows that the Case was Far from Overwhelming . . . . . . . . . . . . . . . . . . . 40

    c.     The Police Investigation Left Unanswered Questions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

E.     Exhaustion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Ground II

    Trial Counsel Was Ineffective for Not Objecting to an Instruction on Eyewitness Identification Testimony Which (1) Failed to Tell the Jury it Could Receive the Testimony with Caution, and (2) Created a Conclusive Presumption That the Eyewitness' Certainty Made His Identification Unassailable. The Trial Court Violated Petitioner's Due Process Rights by Creating this Conclusive Presumption on an Ultimate Issue at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

    A.    The Instruction that was Given . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

    B.    Flaws in the Given Instruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    1.    The Instruction Failed to Tell Jurors that They Could Receive Identification Testimony with Caution and What Factors Should Lead Them to Do So . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    2.    The Instruction Created an Unconstitutional Mandatory Presumption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    C.    Exhaustion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Ground III

    The Prosecutor Engaged in Racial Discrimination in Violation of Petitioner's Rights Under the Equal Protection Clause of the Fourteenth Amendment and *Batson v. Kentucky* . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    A.    Legal Framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    B.    Petitioner Established a *Prima Facie* Case of Race Discrimination in Jury Selection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

    C.    The Prosecutor's "Race Neutral" Reasons . . . . . . . . . . . . . . . . . . . . 55

    D.    The Prosecutor's Reasons Were Pretextual: Discrimination was at Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

        1.    Juror Number 50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
        2.    Juror Number 13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

iv

E.       No AEDPA Deference is Due   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

F.       Exhaustion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Ground IV
      The Prosecutor's Comment on Petitioner's Failure to Share Exculpatory
      Evidence with the Prosecution Before Trial, Violated Petitioner's Due
      Process Right to Post-arrest, Post-*Miranda* Silence . . . . . . . . . . . . . . . . . 62

Ground V
      Trial, Direct Appeal and PCRA Counsel Ineffectively Failed to Object
      to the Court's Incomplete Instruction to the Jury Regarding Petitioner's
      Exercise of His Constitutional Right Not to Testify   . . . . . . . . . . . . . . . . 68

Ground VI
      The Trial Court Erred in Providing a Reasonable-doubt Instruction
      Suggesting to Jurors That They Could Ignore Doubts Causing Hesitation
      in Matters of the Highest Importance. Trial Counsel Was Ineffective for
      Not Objecting to the Instruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Ground VII
      Pervasive Extra-record Vouching and Misstatement of the Evidence in
      the Prosecutor's Summation Rendered Petitioner's Trial an Unfair
      Denial of Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

      A.       Reference to Matters Outside the Record . . . . . . . . . . . . . . . . . . . . 76

      B.       Misstatement of the Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

      C.       Constitutional Errors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Ground VIII
      Defense Counsel Was Ineffective for Arguing That Petitioner Fled from
      Police Because He Possessed of One of the Guns Found at the Crime
      Scene . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Ground IX
      The Trial Court's Misstating and Distorting Evidence in Favor of the
      Prosecution Deprived Petitioner of Due Process . . . . . . . . . . . . . . . . . . . 90

Ground X

    Trial Counsel Was Ineffective for Failing to Investigate and Prepare

    Character Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

Request for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

## PROCEDURAL HISTORY

1.      Petitioner, Saleem Bey, was arrested and charged under Philadelphia County docket numbers CP-51-CR-1209051-2001 and CP-51-CR-1206691-2001 (CCP Phila.), with the November 24, 2001, shooting of Kenneth Thompkins and Terry Swanson – Mr. Swanson died, and Thompkins was wounded.

2.      He was tried in 2004 but a mistrial was declared because the jury could not reach a verdict.

3.      Mr. Bey was retried in 2005.  He was convicted on December 15, 2005. He was subsequently sentenced to life imprisonment without parole.

4.      His direct appeal was denied by the Superior Court of Pennsylvania on May 12, 2008.  *Bey 1.*  Leave to appeal to the Pennsylvania Supreme Court was denied on November 20, 2008, *Commonwealth v. Bey*, 298 EAL 2008 (Pa.Super. 2008).

5.      Petitioner, through counsel, filed a petition under the Pennsylvania Post-Conviction Relief Act (PCRA) on  October 13, 2009.  The petition was ultimately dismissed.  Petitioner took an appeal to the Superior Court, which affirmed the dismissal on June 1, 2012.  *Bey 2.*  Leave to appeal to the Pennsylvania Supreme Court was sought and denied on June 5, 2013, *Commonwealth v. Bey*, 329 EAL 2012 (Pa. 2013).

1

6.     Petitioner was represented at trial by Jack McMahon, Esq.  Petitioner was represented on direct appeal and in post-conviction proceedings by Norris Gelman, Esq.

7.     The trial was presided over by the Honorable John J. Poserina, Jr.  PCRA proceedings were presided over the Honorable Teresa M. Sarmina. The Commonwealth throughout was represented by the District Attorney of Philadelphia.

### PARTIES

8.     Petitioner, Saleem Bey, is a prisoner in the custody of the Pennsylvania Department of Corrections.  He is currently incarcerated at the State Correctional Institution at Greene, in Waynesburg, Pennsylvania, prisoner number GL – 7004.

9.     Louis Folino is the Warden of the State Correctional Institution at Greene and as such he has the immediate control over Petitioner's custody.

### THIS PETITION IS TIMELY UNDER THE ANTI TERRORISM AND EFFECTIVE DEATH PENALTY ACT (AEDPA)

10.     28 U.S.C. § 2244(d)(1) imposes a one year limitations period for the filing of a petition. In applicable part, the one year commences at the conclusion of direct review "or the expiration of the time for seeking such review."

11.     Petitioner's direct appeal was decided by the Superior Court on May 12, 2008.  Leave to appeal was sought and denied on November 20, 2008.  Thus, the

2

"expiration of the time for seeking such review" expired 90 days hence, on February 17, 2009, when Petitioner's time to seek certiorari review in the United States Supreme Court expired without such review being sought.[1]

12.    The AEDPA limitations period is tolled by a properly filed state post-conviction petition (28 U.S.C. § 2244(d)(2)), which Mr. Bey filed on October 13, 2009.  At the time that he properly filed his PCRA petition, Petitioner used 239 days of the one year limitations period.[2]

13.    The limitations period continued to be tolled until June 5, 2013 when the Pennsylvania Supreme Court denied leave to appeal from the denial of Petitioner's PCRA petition.  At the time that leave was denied, Petitioner had 126 days remaining on his one year limitations period (365-239=126).  Thus, the AEDPA limitations period expires on October 8, 2013,[3] and this *Petition* filed on October 4, 2013 is timely.

---

[1]90 days from November 20, 2008 is counted as: 11 days in November; 31 days in December; 31 days in January; and 17 days in February.

[2]239 days is calculated as follows: 12 days in February; 31 days in March; 30 days in April; 31 days in May; 30 days in June; 31 days in July; 31 days in August; 30 days in September; and 13 days in October.

[3]October 8th is the 126th day following denial of leave to appeal, as follows: 26 days in June; 31 days in July; 31 days in August; 30 days in September; and 8 days in October.

## STATEMENT REGARDING EXHAUSTION AND DEFAULT

14.     Each claim for relief contained in this *Petition* was fairly presented to the Pennsylvania courts, or else exhaustion is excused, or was or remains futile.  The point at which each claim was presented is discussed in the body of each claim.

15.     Some of the claims, or portions thereof, were not presented to the state courts because of the ineffective failure of initial state post-conviction counsel to do so.  In those cases, Petitioner can overcome any procedural bar raised by Respondents due to state post-conviction counsel's ineffectiveness.

16.     Since procedural bars are an affirmative defense that must be raised by Respondents or waived, Petitioner will not anticipate which bars, if any, will be raised by Respondents.  He will address any such bar arguments in a reply to Respondents' answer.

## ALLEGATIONS REGARDING THE AEDPA

17.     Under the AEDPA, a writ of habeas corpus may be granted if Petitioner establishes that he has suffered a violation of his rights under the United States Constitution and the state court decision addressing each said violation:

> was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> was based on an unreasonable determination of the facts in light of the

4

evidence presented in the State court proceeding.

28 U.S.C. § 2254 (d) (1) & (2).

18.     For each claim for relief discussed herein, Petitioner alleges that the terms of § 2254 (d) (1) and/or (2) are satisfied – that the relevant state court decisions were contrary to and/or were unreasonable applications of clearly established Federal law, as determined by the Supreme Court of the United States, or were based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

## GROUNDS FOR RELIEF

### GROUND I

**DUE TO A COMBINATION OF PROSECUTORIAL MISCONDUCT, COURT ERROR AND INEFFECTIVE ASSISTANCE OF TRIAL AND APPELLATE COUNSEL, PETITIONER'S TRIAL WAS AWASH IN IMPROPER AND HIGHLY PREJUDICIAL EVIDENCE OF THREATS AND UNRELATED MURDERS**

The trial prosecutor's theory was that the shootings were "a neighborhood thing . . . a South Philly thing. . . . [u]nfinished business. . . . an execution-style slaying." NT 12/14/05 218.17-19.  However, the prosecutor lacked any evidence to support this alleged theory.  He lacked evidence of a conflict existing prior to the shooting, or of any connection between Saleem Bey and the shooting victims, beyond each living in South Philadelphia.

5

Lacking any evidence connecting Petitioner to any pre-existing conflict with the shooting victims, or anyone else, the prosecutor presented evidence that the two shooting victims had friends and family members who had been murdered (six in total), and suggested that the surviving victim, Kenneth Thompkins, was fearful of being involved in the case. The prosecutor attempted to connect Thompkins fear to the six murders that bore no relationship or connection to Petitioner.

Because this "extraneous violence" evidence was not connected to Saleem Bey, it was inadmissible under Pennsylvania law to prove Petitioner's guilt. The prosecutor argued that this evidence was admissible to prove surviving victim Kenneth Thompkins' "state of mind," *i.e.* that he was fearful, which in turn, explained why Thompkins gave an inconsistent identification of the shooter to Mr. Bey's prior defense counsel and a private investigator.[4]

On PCRA review, the Court of Common Pleas correctly held that admitting the evidence for the "state of mind" purpose was error, though such error did not prejudice Petitioner because the evidence of his guilt was overwhelming. *TCO*, at *8.

After explaining how the prosecution introduced a mountain of evidence about these unrelated murders and Mr. Thompkins' fear, Petitioner will show that this

---

[4]As explained below, Mr. Thompkins told Homicide detectives on the day after the shooting that he did not see the shooter. He testified consistently at trial in 2005; however, that subsequent to the shooting, he spoke with prior defense counsel Brian McMonagle and said that he saw the shooter, and the shooter was not Saleem Bey.

6

evidence was improperly admitted and prejudiced Mr. Bey. Petitioner will show that far from being "overwhelming" that the evidence against Petitioner was sparse, and that the state courts' conclusions to the contrary were unreasonable based on the record facts. Petitioner will also demonstrate that the prosecutor's introduction and use of this evidence were acts of misconduct which so infected Petitioner's trial as to render it a denial of due process under the Fourteenth Amendment to the United States Constitution. Petitioner's defense counsel's failure to object to the admission of this evidence or to request a limiting instruction was ineffective. Similarly, direct appeal counsel ineffectively failed to present the bulk of this claim to the state courts, which was also ineffective under the Sixth Amendment to the United States Constitution.

## A.   Kenneth Thompkins' Testimony and Use of Prior Statements

Kenneth Thompkins' testimony was not probative of who shot him and Terry Swanson. He testified that he did not see who had shot him or Mr. Swanson because it was dark and he was shot from behind. NT 12/13/05 55.20-56.10. After he was shot, police took Mr. Thompkins to Jefferson Hospital, and at 2:15 p.m. that same day he provided detectives with a statement. *Id.* at 56.11-57.10. This statement was consistent with Mr. Thompkins' trial testimony, saying that he could not see who shot him or Mr. Swanson. *Id.* at 145.6-146.11; *see also* Thompkins Statement, 11/24/01.

7

On April 4, 2002, roughly five-and-a-half months after the shooting, Mr. Thompkins gave a statement to then-defense counsel Brian McMonagle in which Mr. Thompkins identified the shooter as a "big dark skin bald headed guy with a beard." He specifically indicated that Petitioner was not the shooter. *Id.* at 60.3-65.9, 68.8-13; *see also* Thompkins Statement, 4/4/02.[5]

At the 2005 trial, Mr. Thompkins said that this statement to the defense was false and that he had made it up because he wanted to know what Mr. McMonagle and his private investigator knew about the case, so he "made up some shit to see what [they] knew." He elaborated that the private investigator had police reports which he wanted to see (since police had not shared them or any information about the shooting) and he felt that making up a story was the only way the investigator would share the reports with him. *Id.* at 65.10-11, 66.5-12; 72.6-8, 135.7-11; 81.18-82.17.

Between the day after the shooting and the December 2005 trial, the prosecutor and police detectives were only able to locate and speak with Mr. Thompkins twice: (1) on January 13, 2005, when he was in court on an unrelated case, and (2) on December 8, 2005, the day before trial began, when he was in custody. *Id.* at 146.20-

---

[5] Mr. Thompkins gave a second statement to Mr. McMonagle's private investigator, Diane Cowan, similar to the one he had given to Mr. McMonagle. NT 12/13/05 68.17-71.6; *see also* Thompkins Statement, 5/7/04.

149.14, 178.18-179.16.  Both times, Mr. Thompkins was brought to a meeting with the prosecutor and detectives and provided them with no new information, repeating, as he did in his police statement and at the December 2005 trial, that he had not seen the shooter. *Id.* at 152.17-22, 180.5-15. Yet, these two meetings played a significant role at trial because of what the prosecutor and Detectives Charles Boyle and Marlina Mosely alleged that Mr. Thompkins said to them during the meetings.

### 1.     The December 2005 Meeting

In examining Mr. Thompkins about their December 8, 2005, meeting, the prosecutor read a statement taken by Detective Mosely at that meeting, in which Mr. Thompkins said, "I said some other guy shot me, but the truth is I don't know who did it. I got shot from behind. I only said that some other guy shot me to protect myself and my family." *Id.* at 77-9.15.  Mr. Gilson then pressed Mr. Thompkins to explain his need for protection.  *Id.* at 77.20-78.5.  The prosecutor asked Mr. Thompkins: "*Do you remember telling me you weren't trying to get shot again?*" Mr. Thompkins denied saying this. *Id.* at 78.6-8. The prosecutor asked Mr. Thompkins, "*Do you remember telling me the cops couldn't always protect you?*" and Mr. Thompkins explained that he had only said this in response to the prosecutor's question as to why he carried a gun. *Id.* at 78.9-13.

9

At this point, the court sustained an objection for leading the witness and instructed the prosecutor to ask Mr. Thompkins what he said in an open-ended manner. *Id.* at 78.22-79.11. The prosecutor ignored the ruling and asked Mr. Thompkins, "Do you remember saying, sir, that if I do the right thing I'll be dead?" *Id.* at 79.24-25. Mr. Thompkins vociferously denied saying this. *Id.* at 80.2.[6]

After this question, which suggested that Mr. Thompkins was in danger of being murdered, the prosecutor asked, "What happened to Terry Swanson's brother and his cousin?" *Id.* at 80.11-12. The judge sustained an objection to this question, ruling that it was "beyond the scope." *Id.* at 80.14-15. The prosecutor responded by asking, "What happened to your brother?" *Id.* at 80.17. This time, the judge did not sustain the renewed objection, allowed the witness to answer the question, and provided a cryptic and unresponsive limiting instruction[7] – the only such instruction given with respect to the mass of evidence of other murders and the witnesses alleged

---

[6] "Fuck no. . . . Listen, you trying to make it like I'm scared. None of these people in here pose no threat to me. I don't give a fuck about nobody in this courtroom like for real, like whatever you saying they intimidating me or whatever. Whatever happened happened. I'm prepared for that and I got prepared." NT 12/13/05 80.2-10.

[7] "Members of the jury, just to straighten this out, you saw the demeanor of the person as he was cursing and so forth and it's up to you to assess his credibility. However, only certain evidence can come in about his state of mind and that's the only purpose of this examination right now. You may go forward." NT 12/13/05 80.25-81.8.

fear. *Id.* at 80.18-81.8.

The December 2005 meeting was the first topic about which Detective Marlina Mosely was examined. *Id.* at 178.18. Detective Mosely read the statement noted above. *Id.* at 182.7-13. She testified that, in addition to the one line about "protect[ing] myself and my family" recorded in the statement, Mr. Thompkins told her "off-the-record" that he had spoken with Brian McMonagle and the investigator because he did not want to get shot again and had family living in South Philadelphia who would be in danger if he said anything other than what he said to Mr. McMonagle.   *Id.* at 180.22-181.6.   Detective Mosely also testified that Mr. Thompkins said he was afraid because "he had a brother that was killed, two brothers that were killed, and a friend, Terry Swanson, who was killed, and Terry Swanson's twin brother was killed and two of his cousins – two of Terry's cousins were murdered." *Id.* at 182.14-24. Detective Mosely then testified that these statements were not included in the signed statement which she took from Mr. Thompkins because he did not want them memorialized and would not sign a statement with them in it. *Id.* at 183.7-15.

## 2.    The January 2005 Meeting

Mr. Thompkins was examined only briefly about the January 2005 meeting, saying that the police and a couple of detectives were waiting for him in court, and

11

when he was finished they took him into custody to the crime scene where he walked them through what happened and repeated that he had not seen who shot him or Mr. Swanson. *Id.* at 87.2-88.23.

The prosecutor examined Detective Charles Boyle at length about the January 2005 meeting. On cross-examination, Detective Boyle acknowledged that he did not fill out an interview form or otherwise record the statements Mr. Thompkins made at this meeting. *Id.* at 164.6-24. Detective Boyle testified that when he asked Mr. Thompkins why he had not come to the first trial in 2004, Thompkins said that he was scared and said "Oh, Boyle, you can't protect me and you can't protect my family." *Id.* at 151.14-20.

### B.   Other Evidence of Irrelevant and Highly Prejudicial Violence

Beyond repeated reference to the six unrelated murders and unrecorded statements which Mr. Thompkins allegedly made to the prosecutor and Detectives Wilson and Boyle, evidence of Kenneth Thompkins' fear and the case's connection to generalized neighborhood violence permeated the remainder of the trial in several ways: (a) Detective Boyle's testimony about a secret motive that he could not tell the jury about, (b) the prosecutor's repeated reference to Mr. Thompkins' fear of testifying, and (c) reference to the victims' ties to violence.

### 1.    The Secret Motive

On cross examination, Detective Boyle said, "[Although] Mr. Thompkins didn't directly come out and tell us there was a motive . . . Detective Mangold and myself knew the motive." *Id.* at 156.25-159.7.  On re-direct, the prosecutor followed up on this response, asking Detective Boyle, "Back when Terry Swanson was shot and killed, were you part of some homicide detail?" *Id.* 170.4-6. Although an objection was sustained before Detective Boyle could testify about the relationship between that "homicide detail"and the case on trial,[8] the prosecutor responded by asking Detective Boyle, "You didn't get a motive [from Kenneth Thompkins] . . . [but t]hat doesn't mean there is[n't] one, is there?" *Id.* at 174.3-20. The court sustained an objection, ruling that the question was argumentative, and the prosecutor ended his examination of Detective Boyle, suggesting a "secret motive" which the court would not let the detective discuss. *Id.* at 174.21-25.

### 2.    Thompkins' Alleged Fear

In addition to the alleged statements of fear made by Kenneth Thompkins during the January and December 2005 meetings, the prosecutor emphasized Mr.

---

[8] The prosecutor argued at sidebar, "Detective Boyle is assigned to a task force to investigate shootings in Philadelphia. Terry Swanson has been murdered, Kevin Jackson has been murdered, cousin Ricky Stevenson has been murdered. It has been a series of things. . . . It was part of a series of murders that were occurring in South Philadelphia." NT 12/13/05 171.7-20. The court correctly ruled, "these collateral matters are not before this jury." *Id.* at 173.16-17.

13

Thompkins' fear at the following points in trial:

- Asking, "Why don't you want to be here?" *Id.* at 65.17;

- Asking why he had never come to court before. *Id.* at 72.9-25;

- Asking "[I]f you were shot four times in the back and your friend

  was killed, explain to us why you don't want to be a part of this."

  *Id.* at 81.10-12;

- Asking "What do you think would happen to you or your family

  if you were to come to this courtroom?" *Id.* at 82.25-83.5.

- Noting that Mr. Thompkins kept looking out into the audience

  and asking, "Who are these people? Do you know them? . . . Are

  you intimidated by testifying here today?" *Id.* at 89.7-90.5.

### 3. Reference to the Victims' Ties to Violence

On re-direct examination of Kenneth Thompkins, the prosecutor noted that Mr.

Thompkins was currently in custody on a "gun case."[9] *Id.* at 136.20.  He also elicited

lengthy testimony from two witnesses, Officer John Finor and Coroner Dr. Gregory

McDonald, that Terry Swanson's body had artifact bullets in it from earlier shootings.

*Id.* at 231.12-233.6 (Officer Finor), NT 12/14/05 16.10-19.8 (Dr. McDonald).

---

[9] Defense counsel elicited on cross-examination that Mr. Thompkins had
recently been sentenced for illegal possession of a firearm. NT 12/13/05 128.14-
129.2.

### C.   Evidence of Other Murders and Kenneth Thompkins' Fear Was Improperly Admitted

The above described evidence of extraneous violence was not admissible because it was (i) irrelevant to proving Petitioner's guilt, (ii) hearsay (without an exception or non-hearsay purpose), (iii) more prejudicial than probative (assuming there was a purpose other than proving petitioner's guilt).  The evidence, comments and arguments were also put before the jury in violation of multiple rulings against its admission.

### 1.   The Evidence was Irrelevant

Under Pennsylvania law, evidence of threats or the witness' fear is not relevant to prove the defendant's guilt unless the defendant is linked as the cause of the fear. *Commonwealth v. Carr*, 259 A.2d 165, 167 (Pa. 1969). The prosecutor did not argue that the fear/other-murders evidence was relevant to Petitioner's guilt,[10] and at no point in the appellate or collateral-review proceedings has the Commonwealth argued that the evidence of extraneous violence and fear was admissible for this purpose,

---

[10] *See* NT 12/13/05 48.17-49.21 ("[Defense c]ounsel, I submit, does not quite understand the idea behind [the fear/other-murders] evidence. He is correct. There is nothing in this case to show Mr. Bey intimidated or threatened. . . . Or anything like that. However, the fact is this. . . . The witness' state of mind as to why he made prior statements inconsistent with statements to the detectives is relevant and admissible.").

although this is exactly what the prosecutor used the evidence to argue.[11]

> ## 2. The Evidence Was Inadmissible to Prove Why Thompkins Made a Prior Inconsistent Statement Because Such Evidence Was Hearsay and Far More Prejudicial than Probative

In its PCRA opinion the Pennsylvania Superior Court held that there was no error in admitting evidence of the six unrelated murders because "[t]estimony regarding a witness' prior inconsistent statement is admissible to explain why the witness may have previously given a false statement." *Bey 2*, at *5 (citing *Commonwealth v. Collins*, 702 A.2d 540 (Pa. 1997) and *Commonwealth v. Randall*, 758 A.2d 669 (Pa. Super. Ct. 2000)). Assuming that the Superior Court meant that evidence of threats and fear may be relevant to proving why a witness gives a prior statement which the witness later claims is false (even if such evidence is inadmissible to prove the defendant's guilt because there is no connection to the defendant) – as both *Randall* and *Collins* hold – the Court mistook a condition necessary to admit evidence (relevance) for a sufficient condition for admissibility. Pursuant to *Collins* and *Randall*, evidence is not automatically admissible just because it has a purpose of explaining a prior false/inconsistent statement: the

---

[11] *See, e.g.*, "This is a neighborhood thing. It's a South Philly thing. Unfinished business." NT 12/14/05 218.17-18.

evidence must still satisfy the rules against hearsay and prejudice.[12] Even if the pervasive references to Kenneth Thompkins' fear and the murders of his friends and family were marginally relevant to explaining his statement to prior defense counsel – they were not – the Superior Court failed to consider whether it was admissible under the relevant hearsay rules and whether its prejudice far outweighed it probative value.

### a.    Hearsay

All of the above-described statements attributed to Thompkins were hearsay. They were out-of-court statements made by Thompkins that were offered to prove the truth of the matter asserted, that he was afraid. Pa. R. Evid. 801(c). As such, they were inadmissible. Pa. R. Evid. 802.  Defense counsel ineffectively failed to object on hearsay grounds to the introduction of any of the fears/other-murders evidence.

---

[12]In *Collins*, the witness accused the defendant in a police statement and at the preliminary hearing but recanted at trial, testifying that he had lied at the earlier hearing as he was afraid and was still afraid to be prison. The fear evidence in *Collins* was not hearsay because it was the witness describing his own present and past feeling, and the Pennsylvania Supreme Court was careful to explain how the witness' fear was general (about being in prison), not suggesting in any way that it was caused by the defendant, and thus was not prejudicial. 702 A.2d at 743-44. In *Randall*, the witness accused the defendant at trial, though he had not done so at the preliminary hearing. At trial, the witness said that he had not told the whole truth at the preliminary hearing because he was afraid to testify, and the prosecution introduced a second witness to testify to the first witness's fearful demeanor at the preliminary hearing. Again, this demeanor evidence was not inadmissible hearsay. The appellate court also noted that a careful instruction was given to limit the prejudicial effect of the second witness' fear testimony. 758 A.2d at 676-78.

Although Pennsylvania has a hearsay exception for prior inconsistent statements given under oath at a formal legal proceeding, reduced to a writing signed and adopted by the declarant, or recorded verbatim and contemporaneously verbatim recording of the declarant's statements, (*see Commonwealth v. Lively*, 610 A.2d 7, 10 (Pa. 1992)), with one possible exception, none of the statements satisfy this hearsay exception: they were not recorded, signed or adopted by Thompkins.[13]

Although the prosecutor argued that the fear/other-murders evidence was probative of Thompkins' "state of mind," and the trial court at times accepted this argument, the evidence did not satisfy the state-of-mind exception to the hearsay rule, which requires a "statement of the declarant's *then-existing* state of mind." Pa. R. Evid. 803(3). The statements which Mr. Thompkins allegedly made to the prosecutor and the detectives did not describe his state of mind during the meetings, but years earlier when he spoke with Mr. McMonagle and the private investigator.

The Court of Common Pleas on collateral review (Sarmina, J.) correctly concluded that "the statement [to Detective Mosely about the six unrelated murders] was not admissible to prove state of mind" because it was not probative of the

---

[13]The only statement that might satisfy this rule is the one sentence from Mr. Thompkins' December 8, 2005, interview with Detective Mosely: "I only said that some other guy shot me to protect myself and my family." All of the other statements were not recorded, much less signed and adopted by Mr. Thompkins.

speaker's mind at the time of the statement, and the trial court (Poserina, J.) should have told the jury to disregard reference to the statement. *TCO,* at *8.[14]  The court's reasoning applies equally to the other hearsay statements mentioned by the prosecutor and two detectives.

The fear/other-murders evidence was also inadmissible for the non-hearsay purpose of impeaching Mr. Thompkins.  Under Pennsylvania law, "It is established that counsel may cross-examine his own witness . . . when the witness has given testimony which was unexpected, contradictory to statements which the witness had made earlier, *and harmful to the party calling the witness and beneficial to the opposing side.*" *Commonwealth v. Smith*, 513 A.2d 1371, 1376 (Pa. 1986); *see also* 27 Standard Pennsylvania Practice 2d § 136:164 ("Impeachment of Party's Own Witness"). Kenneth Thompkins testified at trial that he spoke with Mr. McMonagle and identified a shooter because he wanted to see police reports about who shot him and felt that making up a story was the only way the reports would be shared with him. NT 12/13/05 65.10-11, 66.5-12, 72.6-8, 81.18-82.17. This was the only statement to be impeached,[15] and it was a perfectly rational reason which was not

---

[14] The court also noted that this improper testimony was "sprung on the defense at trial out of nowhere," as it was not in any statement provided to defense counsel. *TCO.* at *8 n.11.

[15] Fear as the motivation to speak to Mr. McMonagle does not impeach either seeing or not seeing the shooter; it only impeaches wanting to see the police reports

harmful to the prosecution or beneficial to the defense.[16]

Even if the statements – that Mr. Thompkins spoke with Mr. McMonagle out of fear – were admissible to impeach, they would not be admissible substantively to prove that Mr. Thompkins was afraid, which was how they were used in the prosecutor's closing argument. They would only be admissible to discredit Mr. Thompkins' character for truthfulness, a point on which the inconsistent reason for speaking with Mr. McMonagle had little probative value.[17]

### b.    Prejudice Far Out-Weighed Probative Value

All of the evidence regarding witness intimidation and neighborhood violence was exceedingly prejudicial in comparison with its slight probative value, making it inadmissible under Pa. R. Evid. 403.

Repetitive testimony, and prosecutorial argument, about unrelated murders and

---

as the motivation to speak to Mr. McMonagle.

[16]The depths of the prosecutor's ardor to present fears/other-murders evidence is shown by his impeaching Mr. Thompkins' rational explanation with an incredible one: that if Mr. Thompkins did not name a shooter in the murder, someone (other than Mr. Bey) would label him a "snitch" and kill him because he had said, "I didn't see anything," when cornered by police in the Intensive Care Unit of the hospital; and that his fear of being involved in the trial led him to voluntarily give a statement turning him into a key witness, even though no police had been able to contact him about the case.

[17]Especially since Mr. Thompkins' character was already tainted by his in-court demeanor and other incredible testimony.

Kenneth Thompkins' fear had virtually no probative value with regard to the ostensible reason for offering it: to show why Thompkins identified a shooter to prior defense counsel.  The reason Thompkins gave at trial for providing a statement to prior defense counsel McMonagle (wanting to see police reports about an incident in which he was shot four times, when the police and prosecution had not provided him with the same) was reasonable, and the alternative explanation presented by the prosecutor was bizarre.

Kenneth Thompkins was not called as a prosecution witness to testify that he did not see the shooter.  Rather, he was called as a ruse by which the prosecution was able to introduce highly prejudicial evidence implying his fear of Petitioner and Petitioner's alleged, but non-existent, connection with six other murders and neighborhood violence. This pretext is shown by the prosecutor's argument at the beginning and end of the trial:

> When I made my opening statement, I told you, I think one word. I asked you – I said one word when Kenneth Thompkins testified. One thing I asked you to keep in mind. I think that word was fear. Fear. *Fear is a factor in a murder case.*

NT 12/14/05 227.14-19 (closing argument). The prosecutor argued that Kenneth Thompkins' fear was relevant to the murder case to show who shot Terry Swanson and the shooter's motive.  It was not actually offered for the sole legitimate basis –

21

that Thompkins gave an inconsistent statement to prior defense counsel.  Indeed, the

prosecutor devoted the bulk of the end of his substantive argument on closing to

Kenneth Thompkins and his alleged fear.[18]   *Id.* at 227.13-239.24, 241.2-14.  The last

word the jurors heard in this case, was not about overwhelming eyewitness testimony

– there was none – but was an insinuation of neighborhood violence and exhortation

for the jurors to clean up their community:

> I submit, you jurors, you sat here, you listened to it. You know *what it's
> about*. You don't need me or anyone else to tell you what happened that
> night *and why*. You know. You don't need anyone else to tell you who
> did it or didn't. You know. The only question now, though, the only
> question now is what are you going to do about it? Thank you."

*Id.* at 241.6-14

Witness intimidation and neighborhood violence were the prosecutor's main

themes, and the only evidence of it (besides that the victims and defendant were all

---

[18]The prosecutor's closing argument was rife with such improper references,
of which the following are examples:

> Folks, that was the epitome of fear. He oozed it. You could smell it. He
> spent his entire time on that stand looking out here to see who was here
> and who was watching him. NT 12/14/05 227.22-25;

> This is a man who deals with death. It's real to him. It is not something
> he sees on the 6 o'clock news or reads about in the paper. It happens to
> him. *Id.* at 228.11-14; and

> Now, why is he running from me? And why is he running to them? Ask
> yourself that question. He's afraid to come and testify. Afraid of what
> and afraid *of whom? That's the question.* 230.18-22

from South Philadelphia), was improperly admitted in connection with the witness Kenneth Thompkins.

> ### c. This Prohibited "Evidence" and Comments About It Were Introduced in Violation of the Trial Court's Evidentiary Rulings

Because the recurrent references to witness intimidation and neighborhood violence were irrelevant, hearsay, and were improperly prejudicial compared to the slight or non-existent relevance, the court ruled such evidence inadmissible at several points, but the prosecutor simply bulled his way through these rulings.

During a series of leading questions about what Thompkins had told the prosecutor during their meetings, the judge sustained an objection to leading. NT 12/13/05 78.20-79.11. The prosecutor, determined to introduce the factor of fear, responded to the ruling by asking, "Do you remember saying, sir, if I do the right thing I'll be dead?" *Id.* at 79.24-25. There was no objection nor did the court correct the prosecutor.

Almost immediately, the prosecutor asked Thompkins what happened to Terry Swanson's brother and cousin (who were murdered), and the court sustained an objection, explaining, "It is beyond the scope." *Id.* at 80-11.15. Right after the ruling, the prosecutor asked "What happened to your brother?" (who was murdered), defense counsel objected, and the court then changed its mind about whether testimony on

unrelated murders was "beyond the scope," instructing the jury that it could "come in about [Mr. Thompkins'] state of mind." *Id.* at 80.17-81.6.

Later, during examination of Detective Boyle, the court reversed course and again ruled that evidence of other murders was inadmissible, telling the prosecutor, "Hold it. Enough talking. I'm ruling right now that these collateral matters are not before this jury." *Id.* at 173.15-17. The prosecutor pressed on, first by suggesting that there was some connection between the motives behind the murders and Petitioner's case, *id.* at 174.17-25, and then by eliciting testimony about the other murders from the next witness, Detective Mosely, *id.* at 182.19-183.6. When Detective Mosely testified about the other murders and the prosecutor asked follow-up questions about them, defense counsel did not object nor did the court react.

At times, motions and objections were decided not by the court but by the prosecutor. For example, before Kenneth Thompkins testified, defense counsel moved to exclude from Mr. Thompkins' statements references to fear. NT 12/13/05 47.22-48.15. The prosecutor argued at length that such references were admissible, concluding, without the judge having said a word, by suggesting to defense counsel that the court could give a limiting instruction. *Id.* at 48.16-50.11 Defense counsel consented, though the judge still said nothing: not agreeing or disagreeing that the evidence was admissible, saying whether he would or would not give a limiting

24

instruction, or even saying "okay." *Id.* at 50.12-51.3. Of course, no limiting instruction ever came in connection with fear evidence, and defense counsel never objected to the violation of the prosecutor's agreement.

### d. Curative Instructions

Even assuming that a curative instruction could have limited the evidence's prejudicial effect in light of the prosecutor's conduct, no such instructions were given in this case. The trial judge gave one instruction, well after much prejudicial evidence had come in and well before much to come, which did not say that the evidence was not connected to Petitioner, or that the evidence could not be used to determine Petitioner's guilt, or even that the evidence could only be used to explain Mr. Thompkins' statement to prior defense counsel:

> Members of the jury, just to straighten this out, you saw the demeanor of the person as he was cursing and so forth and it's up to you to assess his credibility. However, only certain evidence can come in about his state of mind and that's the only purpose of this examination right now. You may go forward.

NT 12/13/05 80.25-81.8.

The Superior Court on collateral review held that a comment made by the prosecutor during his closing argument substituted for an instruction from the court:[19]

---

[19]The prosecutor said:

I'm not saying, and I want to be fair about this, that Saleem Bey has anything to do with these other killings. There's no evidence of that and

25

"counsel for the Commonwealth addressed any potential for confusion on the part of the jury by explicitly telling them that there was no evidence connecting Bey with the other killings . . . . [i]n essence . . . voluntarily provid[ing] the limiting instruction Bey now claims his counsel was ineffective for failing to request." *TCO*, at *6.

However, this brief caveat was buried in the middle of the prosecutor's long tirade addressing Thompkins' alleged fear,[20] did not refer to the many witness-intimidation and neighborhood-violence references besides the six unrelated murders, and came from the mouth of the prosecutor, not the judge. Regardless, no instruction could have cured the fact that witness intimidation and neighborhood violence were major themes of the trial and evidence of it was repeatedly elicited with the court's sanction.

In so ruling, the Superior Court ignored clear Pennsylvania law holding that comments by a prosecutor do not substitute for sound instructions provided by the court.  *Commonwealth v. Bicker*, 581 A.2d 147, 153-154 (Pa. 1990):

> that's not why I'm arguing it to you because it's important and it's relevant to Kenny Thompkins' state of mind to help you understand his motivation, what he's thinking and why he does the things that he did.

NT 12/14/05 229.16-23.

[20]For example, it was immediately preceded by the line, "When I was growing up, I used to have a saying that snitches get stitches. Things have changed. Now they have the snitches get ditches. That's reality. And for Kenny Thompkins those aren't idle threats." NT 12/14/05 229.11-15.

It is an axiomatic principle of our jurisprudence that the trial judge has the sole responsibility for instructing the jury on the law as it pertains to the case before them. "The function of elucidating the relevant legal principles belongs to the judge, and the failure to fulfill this function deprives the defendant of a fair trial." *Commonwealth v. Bishop,* 472 Pa. 485, 490, 372 A.2d 794, 796 (1977).

The duty of instructing the jury as to the law which is to be applied during their deliberations cannot be delegated to or usurped by a litigant involved in the trial of the case.

*See also*, *Burkhart v. Washington Metro. Area Transit Auth*., 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards.").

### D.     The Constitutional Violations

The above-described combination of prosecutorial misconduct, court error and ineffective assistance of trial counsel, resulted in the repeated injection of testimony and comments about unrelated murders and Thompkins' fear – none of which were even remotely related to Petitioner's culpability – and which turned the trial into a invective on witness intimidation and neighborhood violence, in violation of due process of law.

The state courts ruling on collateral review that these constitutional errors did not prejudice Petitioner because evidence of his guilt were overwhelming, were

27

unreasonable in light of the evidence presented at trial and available to the courts on collateral review.

_____1.     **Prosecutorial Misconduct**

_____Prosecutorial misconduct may "so infect [a] trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). The Court of a Appeals for the Third Circuit uses a three-part test for assessing such claims, looking at: (1) the severity of the conduct, (2) the effect of curative instructions, and (3) the quantum of evidence against the defendant. *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001).

*Moore*, a federal habeas review of a state court conviction, held that the state courts' denial of a prosecutorial misconduct claim was an unreasonable application of *Donnelly* and *Darden*. *Id.* at 111-20 (prosecutorial misconduct found in view of three improper prosecutorial comments during closing argument,[21] even though after each remark the judge instructed the jury that it was improper and should be completely disregarded); *United States v. Morena*, 547 F.3d 191, 197 (3d Cir. 2008)

---

[21]The prosecutor argued that (1) the defendant, an African-American man, having a white wife made it more likely that he had raped the victim, who was white. *Id.* at 115-16; (2) the defendant being unable to have sex with his wife meant he had "sexual tension" making it more likely that he was the rapist. *Id.* at 116; and (3) if the jury did not believe the victim, they would be "perpetrating a worse assault on her." *Id.* at 116-17.

(holding that "the government's systematic presentation of prejudicial drug evidence [unrelated to the firearm possession charge for which the defendant was standing trial] constituted misconduct in violation of due process," and that the trial judge's warnings that the defendant was not on trial for drug charges, given during testimony and before jury deliberation, were insufficient to cure the error).

Application of the *Moore* analysis demonstrates a clear violation of due process pursuant to *Darden* and *Donnelly*.

**First**, the conduct was severe and pervasive. Improper evidence was elicited and comments were made with regard to several witnesses, comprising a large part the prosecution's examination of the lead investigator, Detective Mosely, and the surviving victim, Kenneth Thompkins. The prosecutor used this improper evidence extensively in closing argument to make an emotional argument about Petitioner's connection to neighborhood violence as the motive for the crime. It would be hard, if not impossible, for the jury to ignore emotionally charged evidence about neighborhood violence and evidence going to as important a matter as motive.[22]

**Second**, the trial court gave only one curative instruction which was grossly

---

[22]*See Thomas v. Hubbard*, 273 F.3d 1164, 1173 (9th Cir. 2001) (finding prosecutorial misconduct "[b]ecause motive provides the jury with a framework within which to analyze the defendant's purported actions, it is extremely difficult to ignore or disregard evidence of motive once it is presented. Similarly . . . a jury would likely be unable to ignore . . . 'emotionally charged,' prejudicial evidence.").

inadequate in that it was confusing, and did not even tell the jury that it could not consider the evidence – the court said only that the jury could consider the evidence with regard to Mr. Thompkins' "state of mind." The trial court did not provide any guidance during the final instructions.  Indeed, the court's waffling (allowing this type of evidence at times and not at other times) added to the confusion and constituted a *de facto* endorsement of such evidence.

**Finally**, as shown below, the evidence against Petitioner was not overwhelming.[23] The sole eyewitness' (Officer Taylor) identification conflicted with the physical evidence and other statements which he and other officers gave. The inconsistencies in the eyewitness identification are troubling not only in a theoretical sense; they also gave the jury pause during its deliberations, although its requests to re-examine the identification testimony were denied.   Indeed, the eyewitness testimony was so far from overwhelming that the trial court provided a so-called *Kloiber* instruction during the final jury instructions.  Pennsylvania law requires this instruction when identification testimony is deemed unreliable.  *See* Pa. Suggested Std. Jury Instr. § 4.07B: "Identification Testimony – Accuracy in Doubt, [this instruction "is appropriate where an eyewitness did not have a clear opportunity to view a defendant, equivocated on the identification of the defendant, or had some

---

[23]*See Moore*, 255 F.3d at 112 ("finding the evidence 'more than sufficient' for conviction does not necessarily end the constitutional inquiry").

difficulty making an identification in the past. *Commonwealth v. Bormack*, 827 A.2d 503, 507-08 (Pa. Super. Ct. 2003).   The trial court's administration of a *Kloiber* instruction is simply inconsistent with the finding that the evidence was overwhelming.

### 2.    Trial Counsel Failure to Object to Some Aspects of the Evidence, Argument and Comments was Ineffective

Trial counsel failed to object to many of the above instances of prosecutorial misconduct.  He failed to object to the admission of still other instances improper evidence of unrelated killings and fear.  He failed to request appropriate instructions with regard to how the jury could receive this evidence – assuming that it was admissible in the first instance.

Under *Strickland v. Washington*,  466 U.S. 668 (1984), counsel's failure to object to inadmissible evidence or argument, or to request proper instructions is deficient because counsel is required by the Sixth Amendment to be familiar with the relevant law.   *See e.g.*, *Williams v. Taylor,* 529 U.S. 362, 395 (2000) (counsel ineffective because he made a decision "not because of any strategic calculation but because" he misunderstood state law).  *See also*, *Discussion Infra* at 48 for cases finding counsel ineffective for failing to request appropriate instructions or for failing to object to instructions that are improper.

31

3.     **The Constitutional Errors – Prosecutorial Misconduct and Ineffective Assistance of Counsel – Were Prejudicial as the Evidence was Far from Overwhelming. The State Court's Conclusion to the Contrary was Unreasonable Based Upon the Record**

Having found that the introduction of evidence of six unrelated murders and of Thompkins' "fear" and the comments made on this evidence was improper, the Court of Common Pleas on collateral review held that this evidence and comments did not prejudice Petitioner because the evidence against him was overwhelming. *TCO*, at *8. The Superior Court agreed because "Mr. Bey was caught 'red-handed'" and thus there was "overwhelming evidence of guilt. *Bey 2*, at *6-7.

As already noted, these findings were unreasonable. The only evidence against Petitioner was the eyewitness testimony of Officer Taylor which was the subject of a cautionary *Kloiber* instruction – thus, this factor alone shows that the evidence was not overwhelming. Additionally, the state courts failed to consider (a) the serious inconsistencies in Taylor's testimony; (b) the jury asked to re-examine identification testimony regarding these ignored inconsistencies, but the trial court denied these requests; and (c) shoddy police investigation left serious gaps in the evidence.

It is initially noteworthy that the state trial court in PCRA review made a number of factual errors in its analysis of the evidence that support Petitioner's view that its overall decision regarding the "overwhelming nature" of the evidence against

32

Petitioner was unreasonable based upon the record facts.

The court began, "Officer Taylor and Sergeant Walton were located *inside* of a *parking garage* when they heard a loud gunshot." *TCO*, at *8. The shooting did not occur indoors or in a parking garage and the officers were not in a garage, as their and other witnesses testified. Using the phrase "inside of a parking garage" (not only here but in the Statement of Facts, *id.* at 2) is simply wrong.

In the very next sentence, the court described how after hearing the first gunshot, "Officer Taylor heard five more shots." *Id.* at 5. In his trial testimony, Officer Taylor could not specify how many shots he heard in the second series, saying it was "probably another four to five, six shots." NT 12/9/05 70.3-5.[24]   This misstatement shows a nonchalance toward accurately reciting the facts of this murder case. This is particularly disturbing in view of the factually-intensive nature of Petitioner's trial defense, and of the claims that he raised in post-conviction and again in this *Petition*.

In the third sentence of the court's review of the "overwhelming" facts, the court stated that "[t]wo males came running toward Officer Taylor and he saw [the suspect], dressed in grey sweat pants, raise a gun and shoot Terry Swanson." *TCO*,

---

[24]In his preliminary hearing testimony, Officer Taylor described simply "a series of gunshots." NT 12/12/01 7.9. In his statement to police on the night of the shootings, Officer Taylor said that he heard "six or seven more shots" in the second series of shots." NT 12/9/05 120.4-8.

at *8.  Although in his statement to Homicide detectives and his preliminary hearing testimony Officer Taylor did say that the man he saw shot was pronounced dead at the scene and was Terry Swanson, NT 12/12/01 9.21-25, at the 2005 trial, Officer Taylor said only that he saw a man in a black jacket and blue jeans get shot, NT 12/9/05 73.20-74.1. When cross-examined on this point, Officer Taylor said he could not say for certain which victim he saw shot because they were wearing similar clothing and both got shot in the back of the head. *Id.* at 140.3-141.20. As mentioned above, Kenneth Thompkins was not shot in the back of the head, and Mr. Thompkins was likely the only victim Officer Taylor could have seen shot according to his other testimony. Moreover, the prosecutor *argued to the jury during closing argument* that Officer Taylor saw Mr. Thompkins get shot. NT 12/14/05 188.12-189.6.  In stating simply that Officer Taylor saw Terry Swanson get shot, the Court of Common Pleas contradicted the testimony, the evidence, and the prosecutor's argument about the only direct evidence connecting Petitioner to the murders, Officer Taylor's eyewitness testimony.

> ### a.    Officer Taylor's Eyewitness Testimony was Inconsistent with His Earlier Testimony and Statements, that of Other Officers and with the Physical Evidence

The two primary inconsistencies in the identification evidence concerned

whom Taylor saw get shot and whether he was in a position to see the shooting while then having a face-to-face encounter with the suspect just moments later.

At trial, both Taylor and his partner, Sergeant Walton, testified that Taylor was in a position to see the shooting because of an encounter with Philadelphia Eagles quarterback, Donovan McNabb: while the two officers were on an island in the middle of Spring Garden Street directing traffic, they followed McNabb as he existed the Palmer Club (on the north side of Spring Garden), crossed Spring Garden, and headed south into a driveway behind the Transit Club.  The two officers stopped at the northern mouth of the driveway with Taylor facing south toward the driveway and Walton facing north, just second before shots rang out further south in the driveway. NT 12/12/05, 111.4-111.22 (Walton); NT 12/9/05, 59.8-63.23 (Taylor).

However, Taylor's preliminary hearing testimony and statement to Homicide Detectives on the night of the shooting made no reference to seeing or following McNabb, thus ending up at the mouth of the driveway just seconds before the shooting began.  In both accounts, Taylor said that he was directing traffic out of the driveway when he heard gunshots.  NT 12/12/01, 6.24-7.9 (preliminary hearing); NT 12/9/05, 117.20-24 (statement).  Moreover, Sergeant Walton's statement to the detectives on the night of the shooting said:

At about 3:25 a.m. myself and Officer Taylor were on crowd and traffic

35

control for the clubs at 6th and Spring Garden Streets.  Both east and westbound traffic on Spring Garden Street were closed.  We heard one and then a series of gunshots coming from the rear parking lot of Transit Club which is located at 600 Spring Garden Street.  I notified Police Radio of the reports of gunshots.  *We proceeded to the opening of the parking lot* and we still heard gunshots as we entered the parking lot.

Walton Statement, 11/24/01; NT 12/12/05, 133,13-135.20.

At trial, Walton testified that his statement meant that he and Taylor proceeded to the mouth of the parking lot, *after* hearing gunshots.  NT 12/12/05, 135.5-8.  Taylor's statement, given just hours after the shootings, was ambiguous about his location when he heard the shots, and Walton's statement placed the two in a completely different location.  The McNabb story, placing Taylor in a prime location to view the shooting, did not appear until the 2004 trial.

Taylor also testified inconsistently about which victim he saw get shot.  In his statement to the detectives, he said that the person he saw get shot was later pronounced dead.  Taylor Statement 11/24/01.[25]  In his preliminary hearing testimony, Taylor was also clear that the person he saw get shot was the deceased victim.  NT 12/12/01, 9.21-25.

However, at the 2005 trial, on direct examination, Taylor said only that he saw a man in a black jacket and blue jeans get shot.  NT 12/9/05, 73.20-74.1.  When cross-

---

[25]This was corroborated by Walton's statement in which he related that Taylor told him that he saw Swanson (the deceased) get shot.

36

examined on this point, Taylor said that he could not say for certain which victim he saw shot because they were wearing similar clothing and both got shot in the back of the head. *Id.*, 140.3-141.20. Taylor was certain that whomever he saw get shot was shot in the back of the head. *Id.*, 135.25-136.3. The identity of the victim would not be particularly critical, except that trial evidence suggested that if Taylor was accurate about not seeing the first victim get shot and seeing the second victim get shot as he was chased northbound, then the only person whom Taylor could have seen shot was Thompkins.[26] But, Thompkins did not get shot in the back of the head. NT 12/13.-5, 55.2-19.

Taylor repeatedly testified that he heard one shot, then a series of shots coming from further south in the driveway but that he did not see any aspect of these first two series of shots except for the muzzle flashes. NT 12/9/05, 63.20-23, 65. 5-21, 68.23-69.4, 69.25-70.11, 134.8-22, 135.9-10, 137.4-12. The only shot that Taylor saw fired was the last bullet, which he said struck a man running northbound about 15-30 feet in front of him. *Id.*, 72.16-25, 73.20-74.1, 74.22-23, 75.5-7, 134.15-18, 161.22. Among the many questions about his testimony, it is hard to fathom how Taylor did not see any of the earlier shots when he was facing in that direction before the shots

---

[26]Mr. Swanson's body was found next to the *southernmost* bullet casing – further south than where Taylor said he saw the shooting. NT 12/13/05, 8.24-9/17 (crime scene testimony).

began.  He testified that the driveway was clear of other people, he and others testified that the lighting was good and the victims were found lying about 15 feet from each other.  NT 12/9/05, 99.18-101.17 (Taylor on lighting); NT 12/13/05 195-207 (Officer Trenwith on lighting); Taylor Statement 11/24/01 (victims found 15 feet apart); Bevidas Statement, 11/24/01 (victims 10 feet apart); Sweeney Statement 11/24/01 (15 feet).

Yet another inconsistency arose from Taylor's statement o Homicide detectives hours after the shooting, Officer Taylor said that he *did* see aspects of the first series of shots: "It happen [sic] so fast, it appeared that the male who I saw get shot was facing my direction, and the shooter came up from behind him. *When I first heard the gunshots, I observed the black male, who was transported to Jefferson Hosp., laying on the ground with blood near him.*" Taylor Statement, 11/24/01, at *1. This aspect of Taylor's statement was not explored at trial.

There were also inconsistencies in Taylor's description of the events with respect to his encounter with the suspect immediately after the last shot.  On direct examination, he testified that "Bey continued to run north in my direction.  I ran right past him," and that the suspect was not looking at him.  NT 12/9/05, 75.15-20.  The prosecutor ignored Taylor's testimony about running past the suspect as he ran north past Taylor.  Instead, he asked Taylor again what he did while the suspect ran north,

and Taylor responded: "[A]s he got within 15 feet of me, I had my weapon already drawn.  I was in uniform.  I began to shout at him, police, drop the gun. . . He immediately looks up . . . That was the initial first eye contact that I had.  He looks right at my face . . . As I looked up, as I was yelling at him, he made like an expression of surprise.  His eyes got really big. . . We made complete eye contact.  He immediately ran to his left . .  Away from me [toward] vehicles parked [along a wall]."  *Id*., 76.7-78.10.  Thus, from one page to the next, Taylor's testimony was again highly inconsistent with respect to eye contact and the direction of flight.  This was inconsistent with Officer Ferrero testimony that he say Taylor chase the suspect southbound through the driveway before the suspect cut west toward the parked cars along the wall.  NT 12/12/05, 16.7-18.5.[27]

---

[27]Yet, there are even more inconsistencies that call into question the legitimacy of the state court's finding of "overwhelming" evidence.  For example:

- There was inconsistent testimony on whether the suspect went to the location where the murder weapon, a .380-caliber handgun, was later found: the driver's side of a Nissan Maxima.  Officer Taylor was certain that when the suspect went behind the parked cars and crouched behind the passenger side of the Nissan Maxima, "He never made it to the other [driver's] side of the car." NT 12/9/05 161.2-8.

This is consistent with Sergeant Walton's testimony that he watched from behind the driver's side of the Maxima as the suspect crouched northbound toward him behind the parked cars but at some point lost sight of him. NT 12/12/09 122.2-123.19.   However, it is inconsistent with Officer Ferrero's testimony that he watched the suspect crouch his way from the passenger's side to the driver's side of the Maxima. *Id.* at 23.1-3, 23.20-22.

39

### b.   The Jury's Two Requests for a Readback of the Identification Testimony Also Shows that the Case was Far from Overwhelming

The jury sent out two notes requesting readbacks related to the identification

testimony of Officer Taylor.  The notes read:

- May we have or hear the transcript of Officer Taylor's testimony describing from the time the officer heard the first shot to when defendant ran west towards the wall?  NT 12/15/01, 30.17-21; and

- May we also have [the] statement where Officer Taylor says he saw the defendant shoot Swanson?  *Id.*, 37.11-13.

---

- There was inconsistency as to whether any civilian witnesses to the shootings remained on the scene.  Taylor said that after securing Petitioner, he went back up the driveway, noticed the two victims, but that in terms of civilian witnesses "everybody that was there was pretty much gone by the time I got there." NT 12/9/05 148.21-23.

- Officer Ferrero said that after Petitioner was taken into custody, police closed off the driveway, not letting anyone enter or exit, and that there were civilians around but when asked if they saw anything "most of them just said no." NT 12/12/05 34.15-35.11, 48.24-50.8.  Officer Michael Givens testified that he arrived on the scene after Petitioner was taken into custody and that there were about 50 civilians gathering around, though "[everyone] that [he] talked to didn't want to be involved." *Id.* at 98.9-17, 104-17-105.4.  Sergeant John Wilson, who transported Kenneth Thompkins to the hospital, provided a statement, which said, "I spoke to a black female, her name was Shanice, I recognized her from being at the crime scene. She told me she was there when the shooting happened. She said I saw [the performer] Beanie Sigal pulling away in his Bently [sic] from the parking lot when the shooting happened. I informed the detective that Shanice was a witness." Sergeant Wilson also said that when he arrived on the scene, after the suspect had been taken into custody, "[t]here was a large crowd and people were in every direction and the vehicle traffic was heavy." *See* Wilson Statement"

40

These notes suggest that the jury, or a portion of it, was having trouble with the same points of inconsistency outlined above.

Initially, the court denied the jury request for a readback of the requested testimony, stating, "These jurors took notes . . . this officer testified in great detail, but the bottom line is was I saw him shoot the other man in the head.  That's what he said."  *Id.*, 31.16-32.17.   The trial court made the same circular error that the collateral review courts made when they each found the evidence overwhelming – crediting Taylor's identification simply because of the eyewitness testimony, and refusing the question the accuracy of this testimony because the evidence was overwhelming.

After defense counsel objected,[28] the court instructed the jury to continue to deliberate because the court reporter was out of the country and the soonest the court could conduct a readback would be the next day, if a readback was possible at all. *Id.*, 34.11-16, 35.19-22, 35.23-36.17.   The jury returned a verdict the same day without the requested readback.

As to the request for Taylor's statement that he saw Swanson get shot, defense

---

[28]Judge, Judge, if it was that simple, the testimony would have been 30 seconds, obviously, and if that's what they believed 100 percent right now, we would not be here.  We would have all left.  They would have found him guilty already." NT 12/15/05, 32.20-25.

counsel suggested that the court seek clarification of the request.  The court agreed, but the request was not fulfilled.   NT 12/15/05, 37.11- 40.1.

Leaving aside criticism of how these requests were addressed by the court – and there is much to critique – these requests show that at least some portion of the jury was having some difficulty with Taylor's testimony.  In short, they tend to show that the evidence was not overwhelming on this central point.

### c.    The Police Investigation Left Unanswered Questions

Again, the state courts' characterization of the evidence as overwhelming in suspect in view of the flawed investigation conducted by the police.

Several police officers testified about trying to locate civilian witnesses among the crowd gathered right after the shooting, but that "most of the [civilians] just said no [they hadn't seen anything], NT 12/12/05, 49.1-50.8 (Ferrero), [or gave] a negative response," *Id.*, 128.1-3 (Walton), or "didn't want to be involved" *Id.*, 104.17-105.4 (Officer Givens).   Allowing potential homicide witnesses to depart under these circumstances is problematic, but pales in comparison to Ferrero's testimony that there was an *occupied* SUV parked right in front of and facing the shootings that was blocking his and Officer Sweeney's approach.  But nobody stopped the SUV from departing, even though Ferrero recalled that Sweeney removed a baseball cap from

42

the hood of the SUV as it began to pull away.  *Id.*, 10.10-17, 35.13-23, 67.25; *see also*, NT 12/9/05 87.18-21, 170.22-23 (Taylor).

Another potential witness who was permitted to leave the scene was a man who ran into Walton while the Sergeant was on the driver's side of the Nissan Maxima watching the shooter crouch behind the passenger side.  Walton testified that he lost sight of the shooter so he headed back east toward the front of the car to look for the suspect when a man who was running west collided with him with such force that two of Walton's teeth were knocked out.  NT 12/12/05, 123.23-124.10.  Walton threw this man to the ground, but once he believed it was not the shooter, he let the man go. Considering that only Taylor claims to have seen Petitioner with a gun, the identity of this unknown man was critical, particularly since his collision with Walton occurred in proximity to where the murder weapon was recovered.  *Id.*, 124.17-148.20, 153.16-21.

The police also neglected to test for the presence of gunpowder residue on Petitioner because, according to Crime Scene Unit Detective Wilson, such testing was of no utility because Petitioner's hands were not bagged, and there was therefore a chance of a false positive.  NT 12/12/05, 206.8-11.  Wilson stated that the testing was not done to protect the rights of Mr. Bey.  NT 12/13/05, 37.21-38.25.

E.      Exhaustion

The bulk of the above described claim (both the facts and the legal theory) were presented to the state courts during the litigation of a post-conviction petition in the trial court and on appeal.

GROUND II

TRIAL COUNSEL WAS INEFFECTIVE FOR NOT OBJECTING TO AN INSTRUCTION ON EYEWITNESS IDENTIFICATION TESTIMONY WHICH (1) FAILED TO TELL THE JURY IT COULD RECEIVE THE TESTIMONY WITH CAUTION, AND (2) CREATED A CONCLUSIVE PRESUMPTION THAT THE EYEWITNESS' CERTAINTY MADE HIS IDENTIFICATION UNASSAILABLE. THE TRIAL COURT VIOLATED PETITIONER'S DUE PROCESS RIGHTS BY CREATING THIS CONCLUSIVE PRESUMPTION ON AN ULTIMATE ISSUE AT TRIAL.

Petitioner was entitled to and ostensibly received a jury instruction regarding the unreliability of the eyewitness testimony presented against him.  Counsel, however, ineffectively failed to object to that portion of the instruction that was erroneous, and also ineffectively failed to object to another portion of that instruction that created a conclusive presumption in violation of due process of law.

A.      The Instruction that was Given

Pennsylvania law has long held that a jury should be provided with a cautionary instruction when the trial court believes there are infirmities in the

identification testimony of a witness:[29]

> Where the witness is not in a position to clearly observe the assailant, or
> he is not positive as to identity, or his positive statements as to identity
> are weakened by qualification or by failure to identify defendant on one
> or more prior occasions, the accuracy of the identification is so doubtful
> that the Court should warn the jury that the testimony as to identity must
> be received with caution.

*Commonwealth v. Kloiber,* 106 A.2d 820, 826–27 (Pa 1954); *see also*,

*Commonwealth v. Rollins*, 738 A.2d 435, n.14 (Pa. 1999); *Commonwealth v. Ali*, 10

A.3d 282, 303 (Pa. 2010) (*quoting Commonwealth v. Gibson*, 688 A.2d 1152, 1162

(Pa. 1997); *Commonwealth v. Collins*, 70 A.3d 1245, 1255-1256 (Pa.Super. 2013);

*Commonwealth v. Bormack*, 827 A.2d 503, 507-508 (Pa.Super. 2003).

---

[29]The Pennsylvania Suggested Standard Criminal Jury Instructions provide two
instructions on eyewitness identification testimony: (1) 4.07A, "Identification
Testimony – Accuracy Not in Doubt," and (2) 4.07B, "Identification Testimony –
Accuracy in Doubt." The latter instruction, 4.07B, "is dictated by the principles set
forth in *Commonwealth v. Kloiber*, 106 A.2d 820 (Pa. 1954)" and is called a *Kloiber*
instruction. § 4.07B, Advisory Committee Note.

The following side-by-side comparison of a proper *Kloiber* instruction with that provided by the trial court, demonstrates the flaws:

| Pa. Suggested Jury Instr. §4.07B | Trial Instruction[30] |
|---|---|
| 1.  In [his] [her] testimony, *[name of witness]* has identified the defendant as the person who committed the crime. There is a question of whether this identification is accurate. | Where a witness is positive of his identification, such as where the opportunity for positive identification is good and the witness is positive in his identification and the identification has not been weakened by any prior failure to identify but remains even after cross-examination positive and unqualified, the testimony as to **identification may not be received with caution**. Indeed, positive testimony as to identity may be treated as a statement of fact. On the other hand, if you believe that a witness is not in a position to clearly observe and was not in a position because of lighting and/or conditions, then you may use that as a factor in determining whether or not that the person actually had the opportunity to observe that which he testified to and a positive identification of a defendant by one witness is sufficient for a conviction. |
| 2.  A victim or other witness can sometimes make a mistake when trying to identify the criminal. If certain factors are present, the accuracy of identification testimony is so doubtful that a jury must receive it with caution. . . . [the instruction then lists a number of factors, which are reproduced in note 35, below] | |
| 3.  If you believe that [this factor is] [one or more of these factors are] present, then you must consider with caution *[name of witness]*'s testimony identifying the defendant as the person who committed the crime. If, however, you do not believe that [this factor] [at least one of these factors] is present, then you need not receive the testimony with caution; you may treat it like any other testimony. . . . | |

---

[30]NT 12/15/05 15.23-16.18

46

**B.      Flaws in the Given Instruction**

In this case, where Petitioner was identified by a single witness (Officer Taylor) and his identification was subject two significant flaws, the instruction provided by the trial court was flawed in to significant respects.[31]

**1.      The Instruction Failed to Tell Jurors that They Could Receive Identification Testimony with Caution and What Factors Should Lead Them to Do So**

Unlike the model instruction, which begins by advising jurors that the identification's accuracy is in question, the given instruction began with what to do if the officer was positive and never told jurors that the identification's accuracy was in question. The model instruction then lists several factors which undermine identification accuracy and twice tells the jury that if it finds any one of these factors, it "must" receive eyewitness testimony with caution.[32] Conversely, the given

---

[31]Officer Taylor was the only witness who testified to seeing either the shooting or Petitioner with the purported murder weapon. The other officers saw Petitioner only after Officer Taylor was pursuing him and calling him the shooter.  No physical or forensic evidence connected Petitioner to the shooting.

[32]The factors which, if present, trigger the need for a *Kloiber* instruction, include:

> [if the witness because of bad position, poor lighting, or other reasons did not have a good opportunity to observe the criminal]

> [if the witness in [his] [her] testimony is not positive as to identity]

> [if the witness's positive testimony as to identity is weakened

47

instruction listed only one accuracy factor—"lighting and/or conditions." It did not tell jurors that if they found this factor they must receive eyewitness testimony with caution, or even that they *may* receive it with caution. Instead, the instruction provided the following vague and circular advice: "if you believe that a witness is not in a position to clearly observe . . . because of lighting and/or conditions, then you may use that as a factor in determining whether or not that the person had the opportunity to observe." The instruction given – omitting the relevant accuracy factors and any mention of caution – did not convey either the criteria that should be used by a jury to evaluate suspect identification testimony, or that if such criteria were found to exist, that the testimony may be received with caution.

Petitioner's trial counsel was ineffective for not recognizing and objecting to these obvious errors, especially in a case turning on one eyewitness' questionable

---

[by qualifications, hedging, or inconsistencies in the rest of [his] [her] testimony]

[by [his] [her] not identifying the defendant, or identifying someone else, as the criminal [at a lineup] [when shown photographs] *[give specifics]* before the trial]]

[if, before the trial, the defendant's request for a [lineup] *[specify request]* to test the ability of the witness to make an identification was denied and the witness subsequently made a less reliable identification]

[if, *[give specifics]*].

Pa. Suggested Jury Instr. §4.07B.

48

identification testimony.   Indeed, counsel have been held ineffective in habeas proceedings for this very type of deficiency.  *See Everett v. Beard*, 290 F.3d 500 (3d Cir. 2002) (counsel ineffective for failing to object to a jury charge not requiring the Commonwealth to prove accomplice's intent to kill to convict of first-degree murder); *Combs v. Coyle,* 205 F.3d 269, 286 (6th Cir. 2000) ("Several other of our sister circuits have granted habeas petitions on the grounds that counsel was ineffective for failing to object to or to propose jury instructions. *See, e.g., Burns v. Gammon,* 260 F.3d 892, 897 (8th Cir. 2001) (granting habeas on ineffective assistance grounds due to counsel's failure to object and thus to prompt a  curative cautionary jury instruction); *Freeman v. Class,* 95 F.3d 639, 642 (8th Cir. 1996) (granting habeas on ineffective assistance grounds due to counsel's failure to request cautionary instructions on accomplice testimony); *United States v. Span*, 75 F.3d 1383, 1389-90 (9th Cir. 1996) (finding ineffective assistance because counsel failed to request a significant jury instruction); *Harris v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) (finding ineffective assistance due, inter alia, to "failure to propose, or except to, jury instructions"); *Gray v. Lynn*, 6 F.3d 265, 271 (5th Cir.1993) (finding ineffectiveness because counsel failed to object to erroneous jury instructions).").

### 2. The Instruction Created an Unconstitutional Mandatory Presumption

In addition to the above flaw, the trial court actually instructed the jury *not to question* the identification testimony, but to accept it as true. The model instruction tells jurors that if they do not find any enumerated factors, they "*need* not" view the identification testimony with caution. Conversely, the given instruction told jurors that they "*may* not" receive the identification testimony with caution. Moreover, the given instruction's predicate to making the identification unassailable did not require jurors to exclude factors undermining eyewitness testimony accuracy. To set up the conclusive presumption, jurors had only to find that "the witness is positive of his identification testimony" and "remains even after cross-examination positive and unqualified." Thus, the trial court told jurors that so long as Officer Taylor testified that the shooter whom he saw was Petitioner (*i.e.* the witness was "positive") and never said it could be anybody else (*i.e.* the testimony was "unqualified"), they "may not" accept the testimony with caution, but must accept his identification. As Officer Taylor repeatedly testified that he was sure of the shooter's identity, the trial court essentially directed a guilty verdict as to the key contested element at trial – the identity of the shooter.

This instruction violated Petitioner's due process rights by creating a

50

conclusive presumption on an ultimate issue at trial, the shooter's identity. A conclusive presumption on an offense element removes the prosecution's burden to prove every element beyond a reasonable doubt, violating the Fourteenth Amendment's Due Process Clause.    *Sandstrom v. Montana*, 442 U.S. 510, 523 (1979) (*citing In re Winship*, 397 U.S. 358, 364 (1970)). A conclusive presumption is created by "language of command" which tells jurors they have no choice but to find an ultimate fact based on finding lesser predicate facts.  *Francis v. Franklin*, 471 U.S. 307, 316 (1985). "[T]he federal constitutional question is whether a reasonable juror could understand" the instruction as requiring a finding on an ultimate fact. *Id.* *Franklin* and *Sandstrom* each held that instructing the jury to "presume" the ultimate fact of intent violated due process because the jury may have interpreted the presumption as conclusive or as shifting the burden of proof to the defendant to rebut the presumption. 442 U.S. at 524; 471 U.S. at 325.

Compared to the "presumption" language in *Sandstrom* and *Franklin*, which is to some degree legalese, in Petitioner's case, the plain-English command "testimony as to identification may not be received with caution" could even more clearly convince a reasonable juror that the only finding needed to establish the shooter's identity was the eyewitness' certainty. Requiring the prosecution to prove only that Officer Taylor appeared certain, not that Petitioner was the shooter, denied

Petitioner his due process right to require the prosecution to prove every element beyond a reasonable doubt.[33]

This error was magnified by the instruction's next sentence, which told jurors that "positive testimony as to identity may be treated as a statement of fact"; the instruction's last sentence, which told jurors that "a positive identification of a defendant by one witness is sufficient for a conviction"; and the instruction's overall failure to note that identification testimony may be received with caution and to list the proper factors for questioning the testimony's accuracy.

Moreover, Petitioner's trial counsel denied him effective assistance of counsel, secured by the Sixth Amendment to the United States Constitution, by failing to object to this mandatory presumption, especially since the shooter's identity, and the accuracy of Officer Taylor's eyewitness testimony, was the main issue at trial.

_____

[33]*Compare Jordan v. Hedgpeth*, No. CV-07-3461-ABC (PLA), 2011 WL 2160357, at *8 (C.D. Cal. May 27, 2011) (magistrate's report on § 2254 habeas petition) ("The 'witness certainty' portion of [the eyewitness identification jury instruction] is framed in neutral terms and is merely one of twelve factors listed in the instruction. It does not require that a jury infer from an eyewitness's certainty about his or her identification that the eyewitness therefore correctly identified the defendant as the perpetrator. *Consequently*, [the instruction] does not involve a constitutionally impermissible presumption that lessens the prosecutor's burden of proof. *See, e.g. Francis v. Franklin*, 471 U.S. 307, 314-15 (1985) . . . . Nor does the instruction impose an 'irrebuttable direction by the court.' *Sandstrom v. Montana*, 442 U.S. 510, 517 (1979)."), *accepted by Jordan v. Hedgpeth*, No. CV 07–3461–ABC (PLA), 2011 WL 2149930 (C.D. Cal. May 31, 2011).

### C.    Exhaustion

The bulk of this claim asserting that the instruction violated *Kloiber* was raised in PCRA proceedings an on PCRA appeal.   Petitioner submits that even if a portion was not presented to the state courts, there is no longer an available remedy to exhaust that aspect of the claim and therefore the claim is arguably procedurally defaulted.   Petitioner submits that initial PCRA counsel was ineffective for failing to raise this obvious flaw in the instructions.   Should Respondents raise this affirmative defense of procedural bar, Petitioner will demonstrate that initial PCRA's counsel's ineffective failure to raise this glaring error was ineffective and that Petitioner thus cause to overcome any asserted default.

## GROUND III

### THE PROSECUTOR ENGAGED IN RACIAL DISCRIMINATION IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT AND *BATSON V. KENTUCKY*

The prosecutor exercised  peremptory strikes in a racially discriminatory manner in violation of Petitioner's rights under the Equal Protection Clause of the Fourteenth Amendment, and *Batson v. Kentucky* and its progeny.

### A.    Legal Framework

Purposeful race discrimination in jury selection violates the Equal Protection

53

Clause of the Fourteenth Amendment. *Batson v. Kentucky*, 476 U.S. 79, 85 (1986) (*citing Strauder v. West Virginia*, 100 U.S. 303 (1880)).

Review of racially biased use of peremptory strikes proceeds in a three step process:   (1) "a defendant must make a *prima facie* showing that a peremptory challenge has been exercised on the basis of [the protected category]," (2) "if that showing has been made, the prosecution must offer a [category]-neutral basis for striking the juror in question," and (3) "in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination." *Snyder v. Louisiana*, 552 U.S. 472, 476-77 (2008) (internal citations and quotations omitted).

To establish a *prima facie* case, the defendant need not show that it was more likely than not that a discriminatory purpose motivated strikes; instead, "suspicions and inferences that discrimination may have infected the jury selection process" should lead the court to the next step of seeking the prosecutor's explanation. *Johnson v. California*, 545 U.S. 162, 172-73 (2005). A "'pattern' of strikes against black jurors" may give rise to such an inference of discrimination. *Batson*, 476 U.S. at 97. Moreover, as happened here, "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant

had made a prima facie showing becomes moot." *Hernandez*, 500 U.S. at 359. In both

establishing a *prima facie* case and the third step of determining whether purposeful

discrimination occurred, side-by-side comparisons of jurors can be a powerful tool.

*Miller-El v. Dretke*, 545 U.S. 231, 241 (2005); *see also Snyder*, 552 U.S. at 483-84.

## B. Petitioner Established a *Prima Facie* Case of Race Discrimination in Jury Selection

With its first nine peremptory strikes, the prosecution peremptorily struck

seven African-American prospective jurors.[34]   With this strike rate of approximately

78% against African American jurors (7 /9 = 7.777), the trial court correctly believed

this pattern established a *prima facie* case of discrimination.  It sought an explanation

for the prosecutor's eighth and ninth strikes and ruled upon the reasons. NT 12/6/05

114.5; NT 12/7/05 29.14-15.[35]

## C. The Prosecutor's "Race Neutral" Reasons

_____The prosecutor provided three reasons for using his eighth peremptory strike

on juror #50 on December 6.  He proffered that he struck her because: (a) she had a

child close in age to Petitioner (her son was 27, and the prosecutor claimed that

---

[34]In responding to the defense challenge to his eighth strike, the prosecutor provided race and ethnicity information regarding for each of his preceding strikes. NT 12/6/05 116.25-117.7.

[35]The selected jury was comprised of six Caucasian and six African American jurors.  NT 12/7/05, 77.10-23.

55

Petitioner was 22), *id.* at 115.11-14; (b) she worked with young children (elementary school librarian), *id.* at 115.15-23; and (c) she had difficulty understanding her role in determining whether to impose the death penalty, *id.* at 114.20-115.11.

The prosecutor provided two reasons for using his ninth peremptory strike on juror #13 on December 7.[36]  He proffered that she (a) lived in South Philadelphia, NT 12/7/05 30.16; and (b) she was eight months' pregnant, *id.* at 30.19.

### D.   The Prosecutor's Reasons Were Pretextual: Discrimination was at Work

#### 1.   Juror Number 50

_____A comparison of the reasons proffered by the prosecutor for striking juror number 50, with jurors whom the prosecutor had an opportunity to accept or reject, shows that the reasons provided for striking this juror were pretextual and that discrimination was at work.

First, five other jurors had children in their twenties, and the prosecutor accepted four (two served on the jury).[37]   Expanding the range to 17-32, the

---

[36]The prospective jurors were renumbered beginning with number 1 on each day.

[37]December 6: #24 (four children ages 21 to 13, NT 12/6/05, 62.25) and #37 (two children ages 24 and 25, *id.*, at 77.8).  December 6: #17 (28 year-old child, NT 12/6/05, 48.15).  December 7: #30 (two children ages 22 and 25, NT 12/7/05 66.13).  The sole other juror with children in their twenties (#11, NT 12/7/05, 56.5-59.12 had a brother was convicted of murder in 1972.

prosecutor accepted six of eight jurors.[38] Including those with any young children, eleven of fourteen were accepted.[39]

Second, five other jurors worked with young children, and three were accepted, including two who served on the jury.[40]

Finally, the prosecutor did not consistently strike jurors for confusion over when to impose the death penalty. Most jurors expressing death-penalty concerns were excused for cause; thus, only three were examined and decided upon by the prosecutor. One of the other two jurors, #1 on December 5, held similar views to juror #50 but was accepted by the prosecutor.[41] The third juror, #24 on December 6, whom

---

[38]December 6: #15 (one child age 32, NT 12/6/05) and #35 (two children ages 17 and 15, *id.*, at 89.12.

[39]December 5: #1 and #7; December 6: #33, #39, #51 (whom the prosecutor called the "perfect juror," NT12/6/05, 125.10-11), and #54.

[40]December 5: #50 (social worker for children with behavioral problems, NT 12/5/05, 85.6-17); December 6: #22 (retired public school teacher for 30 years who then currently taught elementary school, NT 12/6/05, 58.7-10); December 7: #55 (a teacher, NT 12/7/05 95.9-10).

[41]Juror #50 (stricken) stated that she "just d[id]n't know if [she] could commit anyone to death" but then when asked if she could decide the death penalty was appropriate if given proper instructions, she responded, "Yes." NT 12/6/05 11.12-13.11. She expressed some confusion on how much direction the instructions would give her but clarified that she understood that the instructions would not tell her life or death. *Id.* at 110.25-112.1.

Juror #1, Mr. Strohecker (accepted), stated, "I'm questionable. I don't know. . . . I mean, I'm just not sure. It's a tough decision." NT 12/5/05 9.3-7. When asked

the prosecutor also struck peremptorily, had much stronger anti-death-penalty views.[42]

## 2.  Juror Number 13

The trial court found that "[t]he South Philadelphia excuse is just not acceptable to the court" because it was "too wide a range." NT 12/07/05 34.4-7. Thus, this reason cannot refute Petitioner's *prima facie* case of discrimination.

Beyond casting too wide a net, the prosecutor's intentionally striking all jurors who lived in South Philadelphia, a strategy which he confirmed on the record,[43] was evidence of discriminatory intent in jury selection. Jurors' residences may be a surrogate for race. *See, e.g.*, *United States v. Bishop*, 959 F.2d 820, 825-826 (9th Cir.

---

if he could give the death penalty if the law said it was appropriate, he replied, perhaps more hesitantly than juror #50, "I believe so." *Id.* at 9.11. He also expressed confusion over what kind of guidance the instructions would provide, stating, "I'm kind of not sure what appropriate means. I may personally find it appropriate." *Id.* at 9.20-22.

[42]Juror #24 stated, "I don't agree with [the death penalty]" and would only impose it if the law made it mandatory. NT 12/6/05 65.19-21. She also stated that this was a long-held personal/religious view. *Id.* at 66.19-22. This was probably enough for the trial court to excuse #24 for cause, but as the court refused to do so, the prosecutor used a peremptory challenge. *Id.* at 67.3-68.8. Juror #24 was the only juror whom the prosecutor struck who was identified as white.

[43]After the trial court refused to accept the prosecutor's South Philadelphia reason, the prosecutor stated, "I would just like the record to reflect that of the 8 jurors that we have selected so far, not a single one of them lives in South Philadelphia. . . . I've done that for a reason." NT 12/7/05 34.8-13.

58

1992) (finding pretextual the prosecutor's peremptory strike explanation that people from Compton are likely to be "anaesthetized to violence," and reasoning, "where residence is used as a shorthand for racial stereotypes . . . its invocation runs afoul of the guarantees of equal protection."). Moreover, prosecutors in the Philadelphia District Attorney's Office had previously been instructed to use residence as a means of contravening *Batson*'s protections. *See Lark v. Sec'y Pa. Dep't Corr.*, 645 F.3d 596, 601 (3d Cir. 2011) (noting "a video tape . . . in which former prosecutor Jack McMahon instructs his prosecutorial colleagues [at the Philadelphia DA's Office] to exclude potential jurors on the basis of race, gender, occupation, and neighborhood); *Wilson v. Beard*, 426 F.3d 653, 656 (3d Cir. 2005) (noting that the thrust of McMahon's tape was how to keep qualified African-Americans from serving on juries."). The McMahon tape also "advised his audience to avoid black women," explaining, "In my experience, black women, young black women, are very bad. There's an antagonism. I guess because they're downtrodden on two respects they're women and they're and blacks, so they're downtrodden in two areas." *Beard*, 426 F.3d at 657. In Petitioner's case, among the prosecutor's first nine peremptory strikes, six of nine were black women and a seventh was a Hispanic woman.

The prosecutor's other reason for striking juror #13, her being eight months' pregnant, was also pretextual. He significantly overstated the impact of her

pregnancy, the stage at which she was at the time of the voir dire,[44] and failed to move to disqualify her for cause for this reason.  The phrase "eight months' pregnant" was the prosecutor's creation – used to suggest that birth was imminent.  In reality, juror #13 stated that she was due to deliver on January 16th, which was 40 days, or roughly a month and a half, later. NT 12/7/05 27.21. The trial likely would have concluded long before juror #13 was scheduled to deliver.  Moreover, the prosecutor did not ask the judge to excuse #13 for cause based on physical inability nor did he argue, in supporting his peremptory strike, that she might have physical difficulties during trial. His only arguments about her pregnancy were that "jury duty can be very stressful on a person" and that it might be harder for her to get to the courtroom in case of "heavy snow storms or icy conditions." *Id.* at 30.19-31.6. These concerns would also apply to elderly jurors whom the prosecutor found acceptable.  Juror #13 did not respond in the affirmative to the question posed to all jurors about physical ailments potentially impairing their service, stated that she not experienced difficulties during her pregnancy, and stated that she continued to go to work. *Id.* at 28.7-29.3. In short, the prosecutor's concern for her health was also pretextual and does not refute Petitioner's *prima facie* case of purposeful discrimination.

---

[44]At one point the prosecutor even stated – incorrectly – that she was nine months pregnant.  NT 12/7/05, 33.25.

### D.    No AEDPA Deference is Due

The *Batson* claim was raised on direct appeal.  However, the Superior Court did not address it on the merits because it ruled that appellate counsel (Gelman) failed to properly raise it in his 1925 Statement.[45]  *Bey 1* at *6.

When a state court fails to address the merits of a claim that was presented to it because of counsel's procedural miscue, and if the petitioner can overcome the ostensible procedural bar – as Petitioner believes he can – the merits of the claim are reviewed *de novo*.  By its plain language, section 2254(d) applies to a claim only when the state court has issued a "decision" showing that the claim "was adjudicated on the merits."  When the state court has not issued a "decision" regarding the merits of Petitioner's actual federal claim, or has issued a decision that did not "adjudicate[] [the federal claim] on the merits," then the AEDPA standards do not apply and Petitioner is entitled to *de novo* review.[46]

---

[45]*See Pa.R.App.P. 1925.*

[46]*See e.g. Thomas v. Horn*, 570 F.3d 105, 113 (3d Cir. 2009) (Under the Antiterrorism and Effective Death Penalty Act of 1996 ('AEDPA'), 'federal courts are to review a state court's determinations on the merits only to ascertain whether the state court reached a decision that was 'contrary to' or involved an 'unreasonable application' of clearly established Supreme Court law, or if a decision was based on an 'unreasonable determination' of the facts in light of the evidence presented." *Fahy v. Horn,* 516 F.3d 169, 189 n.20 (3d Cir. 2008). But when "the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential standards provided by AEDPA ... do not apply.'  *Appel v. Horn,* 250 F.3d 203, 210 (3d Cir. 2001). 'In such an instance, the federal habeas court must conduct

The Superior Court's alternative ruling that claim was without merit was an unreasonable application of *Batson*. This is because the Court ruled that there was no discrimination because the prosecutor accepted three African-American jurors at the time that the *Batson* challenge was raised. *Bey 1* at *8. Relief of course under *Batson* is available if even a single juror was struck for prohibited reasons. *Batson*, 476 U.S. at 95.

### E. Exhaustion

As noted immediately above, this claim was presented on direct appeal and is therefore fully exhausted.

**GROUND IV**

**THE PROSECUTOR'S COMMENT ON PETITIONER'S FAILURE TO SHARE EXCULPATORY EVIDENCE WITH THE PROSECUTION BEFORE TRIAL, AND OTHER COMMENTS, VIOLATED PETITIONER'S DUE PROCESS RIGHT TO POST-ARREST, POST-*MIRANDA* SILENCE**

To protect the Fifth Amendment privilege against self-incrimination, criminal suspects are told, pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), that they have the right to decline to speak with anyone about the alleged offense. A prosecutor may not discredit exculpatory evidence produced at trial by commenting on the defendant's failure to provide such evidence post-arrest after *Miranda* warning of the

---

a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA." *Id.*))

right to remain silent. *Doyle v. Ohio*, 426 U.S. 610, 618-19 (1976). Such use violates due process. *Id.* ("it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial").

A *Doyle* due process violation occurs when the prosecutor refers to the defendant's silence at any point after the defendant has been arrested and warned of the right to remain silent. *Virgin Islands v. Davis*, 561 F.3d 159, 164-65 (3d Cir. 2009); *Hassine v. Zimmerman*, 160 F.3d 941, 948 (3d Cir. 1998) (prosecutor's cross-examination questions about why the defendant had kept exculpatory evidence to himself during the seven months he spent in jail before trial was a due process violation and an "attempt[] to elicit the precise inferences that the State is prohibited from exploiting under *Doyle*.").

In *Davis*, the Court held it error for the prosecutor to impeach exculpatory evidence of a different shooter by arguing that the defendant had not mentioned it to law enforcement in the months before trial.[47] 561 F.3d at 165. Specifically, the Court held that it violated due process for the prosecutor to state during summation:

---

[47] *Davis* reversed the defendant's conviction and ordered a new trial, conducting a harmless error analysis and concluding that the evidence against that petitioner was not "overwhelming" where the physical evidence did not specify the shooter and "the Government's case against Davis depended largely upon the credibility of its three eyewitnesses." 561 F.3d at 166.

I asked Mr. Davis between January and April, now, have you ever supplied the police with any information concerning where Goofy [the alleged shooter] can be found so the police can arrest him? Where Goofy can be located? Have you ever given? No, no, no. Can you believe that? . . . [I]f the truth was really the truth there was a guy named Goofy and somebody else fired the shots, would you not use everything within your power if it was the truth to notify the police to at least give them a statement that would exonerate yourself. No he didn't do it.

561 F.3d at 162.

In Petitioner's case, the prosecutor made two separate sets of comments on Petitioner's ostensible failure to provide an exculpatory version of the events. Each violated *Doyle* and the Due Process Clause of the Fourteenth Amendment.

### 1.    "Failure" to Provide Thompkins's Statement to the Commonwealth

The prosecutor argued that Thompkins' statements to prior defense counsel – which described the shooter and specifically denied that it was Petitioner – were untrue because Petitioner did not produce the statements until just before trial. The prosecutor began:

[Thompkins] goes to Mr. McMonagle's office and he gives this statement to Mr. McMonagle back in 2002, a statement which, if it is to be believed, if it is to be believed, this is an innocent man, a statement saying that he's an innocent man, and I don't get this until Friday last week.

NT 12/14/05 231.21-232.2.

After defense counsel objected and the court sustained the objection, ruling, "I

64

told the jury it is their own recollection,"[48] *id.* at 232.3-233.11, the prosecutor continued:

> Fine. There is no obligation to give it to me. Fine. Okay. There isn't. There isn't. Okay. But if this is the truth, if this is to be believed, if that's an innocent man, why wouldn't you give it to law enforcement or the prosecutor who has the power to reinvestigate a case where there might be a mistake? You don't think that happens. It happens. Who brought the charges? Who has the power to drop the charges and withdraw the prosecution? I do. Me. My office. Why wouldn't you want to tell me about this so we could reinvestigate it? Why wouldn't you?

*id.* at 233.13-234.2.

This argument contains much the same language as the statement which the *Davis* Court found a *Doyle* violation of petitioner's constitutional right to silence. However, the error in Petitioner's case went beyond that in *Davis*. First, the prosecutor's use of the phrase "if that's an innocent man" suggested to jurors that Petitioner needed to affirmatively speak up to law enforcement to prove that he was innocent. This argument violated Petitioner's presumption of innocence, "th[e] bedrock 'axiomatic and elementary' principle 'whose enforcement lies at the

---

[48]The reason for this odd ruling is that both the trial court and the prosecutor mistakenly believed that whether the prosecutor could comment on Petitioner's pre-trial silence was governed by whether Thompkins' statement to Mr. Monagle contained a disclaimer saying that Mr. McMonagle would provide the statement to law enforcement. Thus, the trial court explained to jurors that if they did recall the statement containing this disclaimer, then the prosecutor could validly comment on Petitioner's silence (believing that Petitioner's right to silence would be subordinated to prior defense counsel's warning to Thompkins).

foundation of the administration of our criminal law.'" *In re Winship*, 397 U.S. 358, 363 (1970) (*citing Coffin v. United States*, 156 U.S. 432 (1895)).  Second, whereas the prosecutor in *Davis* referred to the defendant's ability to exonerate *himself*, in Petitioner's case the prosecutor's statement, "Who has the power . . .? I do. Me. My office," presented himself as the arbiter of guilt or innocence, improperly bolstering his own case.  *See e.g. Commonwealth v. Randall*, 758 A.2d 669, 676 (Pa. Super. 2000) ([I]mproper bolstering or vouching for witnesses by the Commonwealth occurs in two situations: (1) When the prosecution places the prestige of the government behind the witness by personal assurances of the witness's veracity; and (2) when the prosecution indicates that information which is not before the jury supports the witness' testimony.")  Finally, the prosecutor used Petitioner's silence to suggest not only that Thompkins statement were untrue but that Petitioner and his counsel knew they were untrue and were willing to present false evidence. *Id.* at 236.14-16 ("That's the truth? They don't even believe it's the truth because they don't even give it.").

Trial counsel objected to this argument on the ground that the rules of discovery did not require such disclosure.  This was a valid basis upon which to object, as due process cannot tolerate the prosecution's argument that the defendant is guilty because he exercised his rights, *i.e.* to non-disclosure.

Trial counsel ineffectively failed to object to this portion of the argument on

66

Due Process and/or *Doyle* ground.  Similarly, direct appeal and initial PCRA counsel ineffectively failed to raise this error at all.

> **2.     The Prosecutor's Posing of Rhetorical Questions Also Violated Petitioner's Right to Remain Silent Pre-Trial and During Trial**

A criminal defendant has the right to remain silent.  U.S. CONST. AMEND 5 & 14; PA. CONST. Art. I, § 9; *Carter v. Kentucky*, 450 U.S. 288, 305 (1981) ("The freedom of a defendant in a criminal trial to remain silent unless he chooses to speak in the unfettered exercise of his own will is guaranteed by the Fifth Amendment and made applicable to state criminal proceedings through the Fourteenth") (citations and internal quotation marks omitted).

This right was violated when, during closing argument, the prosecutor stated the following rhetorical questions:

> Now, that's something the jury is going to want to know, why did you run from the police, Saleem? Why did you make them chase you? Why were you ducked down and crouched behind cars? Why were you hiding? Why were you trying to conceal yourself? Why?

NT 12/14/05, 206.22-207.3.

These comments on Petitioner's exercise of his right not to testify, violated his Fifth Amendment right to remain silent. *Griffin v. California*, 380 U.S. 609 (1965).

**Exhaustion**

Neither of these instances of improper infringement on Petitioner's right to remain silent were raised on direct appeal or in PCRA proceedings. Direct appeal counsel ineffectively failed to raise them. Initial PCRA was also ineffective for failing to raise this obvious claim.

Petitioner submits that there is no longer an available remedy to exhaust these claim in state court, and therefore the claims are arguably procedurally defaulted. Petitioner submits that initial PCRA counsel's ineffectiveness for failing to raise these obvious flaw in the instructions will provide cause to overcome any bar raised by the Commonwealth.

## GROUND V

### TRIAL, DIRECT APPEAL AND PCRA COUNSEL INEFFECTIVELY FAILED TO OBJECT TO THE COURT'S INCOMPLETE INSTRUCTION TO THE JURY REGARDING PETITIONER'S EXERCISE OF HIS CONSTITUTIONAL RIGHT NOT TO TESTIFY

A criminal defendant has the right to remain silent. U.S. CONST. AMEND 5 & 14; PA. CONST. Art. I, § 9; *Carter v. Kentucky*, 450 U.S. 288, 305 (1981) ("The freedom of a defendant in a criminal trial to remain silent unless he chooses to speak in the unfettered exercise of his own will is guaranteed by the Fifth Amendment and made applicable to state criminal proceedings through the Fourteenth") (citations and

internal quotation marks omitted); *Commonwealth v. Lewis*, 598 A.2d 975 (Pa. 1991).

In order to effectuate that right, Pennsylvania trial courts are obliged, upon request of the defendant, to provide a so-called "no adverse inference" instruction to the jury. *Lewis*, 598 A.2d at 979 ("as a matter of Pennsylvania constitutional law, as under the United States Constitution, criminal defendants in this Commonwealth are entitled to a "no-adverse-inference jury instruction, when a timely request is made to the trial court"). The Pennsylvania Pattern Jury Instruction has long provided the proper no-adverse inference instruction:

> It is entirely up to the defendant in every criminal trial whether or not to testify. [He] [She] has an absolute right founded on the Constitution to remain silent. You must not draw any inference of guilt, or any other inference adverse to the defendant, from the fact that [he] [she] did not testify.

PENNSYLVANIA SUGGESTED STANDARD CRIMINAL JURY INSTRUCTIONS § 3.10A (Crim.), *Defendant's Failure to Testify, No Adverse Inference* (1st ed. 1979); *id*. (2d ed. 2005); *see also*, *Commonwealth v. Hawkins*, 894 A.2d 716, 722, n.11 (Pa. 2006) (endorsing this model instruction); *Commonwealth v. Garcia*, 888 A.2d 663, 634, n1 (Pa. 2005) (same).

The trial court in this case, gave only a portion of the no-adverse inference instruction. It told the jury:

> This defendant chose not to testify in his or own defense. It's entirely up

69

to any defendant in every criminal trial whether or not to testify. He has
an absolute right founded on the Constitution to remain silent. You must
not draw any inference of guilt from the fact that this defendant did not
testify.

NT 12/15/05 14.12-18.  Notably missing from this instruction was that portion
advising the jury that it was not permitted to draw "any other inference adverse to the
defendant" from Petitioner's exercise of his right not to testify.

This is not a minor or technical oversight.  There was much circumstantial
evidence in this case.[49]  Indeed, the trial court instructed the jury on circumstantial
evidence. NT 12/15/05, 11.16-13.20.  By its nature, circumstantial evidence requires
a jury to draw inferences in order to give effect to the base facts that are proven.
Thus, in utilizing circumstantial evidence, the fact-finder is required to determine
whether the base facts were proven and then must decide if reasonable inferences
drawn from those facts establish the ultimate facts.  *See e.g.*, *Commonwealth v.
Hanible*, 30 A.3d 426, 480 (Pa. 2011) (jury must apply logical inference to
circumstantial evidence – in this instance, whether the fact that the defendant used a
deadly weapon on a vital part of the victim's body, established specific intent to kill);
*Commonwealth v. Spell*, 28 A.3d 1274, 1278 (Pa. 2011) ("The Commonwealth may

---

[49]For instance, the prosecution sought to show that Thompkins' earlier
statement exculpating Petitioner as the shooter were motivated by fear.  This was a
circumstantial argument.  The same is true for the prosecution motive arguments that
the shooting occurred over money or because of this was a "South Philadelphia
thing."

use solely circumstantial evidence to prove a killing was intentional, and the fact-finder may infer that the defendant had the specific intent to kill the victim based on the defendants use of a deadly weapon upon a vital part of the victim's body.") (internal quotation marks omitted).

Thus, in Petitioner's case, the jury was told that they should draw no adverse inference of guilt from Petitioner's decision not to testify.  They were not however instructed that they should draw "no other adverse inference" from the multitude of circumstantial evidence that did not directly demonstrate guilt, but which could have been used to establish subsidiary facts at trial.

### Exhaustion

This obvious violation of Petitioner's right to remain silent was not objected to by trial counsel, nor was it – or trial counsel's failure to object to this instruction – raised on direct appeal or by initial PCRA counsel.

Petitioner submits that there is no longer an available remedy to exhaust these claim in state court, and therefore the claims are arguably procedurally defaulted. Petitioner submits that initial PCRA counsel's ineffectiveness for failing to raise this obvious flaw in the instructions and trial counsel's ineffective failure to object, will provide cause to overcome any bar raised by the Commonwealth.

## GROUND VI

### THE TRIAL COURT ERRED IN PROVIDING A REASONABLE-DOUBT INSTRUCTION SUGGESTING TO JURORS RHETORICALLY THEY COULD IGNORE DOUBTS CAUSING HESITATION IN MATTERS OF THE HIGHEST IMPORTANCE. TRIAL COUNSEL WAS INEFFECTIVE FOR NOT OBJECTING TO THE INSTRUCTION

During final jury instructions, the trial court defined reasonable doubt as follows:

> A reasonable doubt is a doubt that would cause a reasonable, careful and sensible person to pause, hesitate *or refrain from acting* on a manner [sic] of highest importance in his or her own affairs or his or her own interests.

NT 12/5/05 5.13-17.   Providing alternative definitions of reasonable doubt – pause/hesitate and refrain – each representing a different degree of doubt, could produce at least two interpretations by jurors: (1) thinking that *either* a doubt causing them to hesitate *or* a doubt causing them to refrain from acting was sufficient to create reasonable doubt; or (2) thinking that they were free to choose whether to define reasonable doubt as one which would cause them to hesitate or one which would cause them to refrain from acting.

The latter interpretation is constitutionally problematic because it allows jurors to ignore doubts which cause them to pause or hesitate, which is a level of doubt which the U.S. Supreme court has repeatedly referred to as the benchmark for

72

reasonable doubt. Thus, the trial court's phrasing its reasonable-doubt instruction in the alternative violated Petitioner's due process right to be convicted beyond all reasonable doubt.

The Due Process Clause of the Fourteenth Amendment requires that the prosecutor prove every offense element beyond a reasonable doubt., *In re Winship*, 397 U.S. 358, 364 (1970).   A definition of reasonable doubt which "suggest[s] a higher degree of doubt than is required under the [proper] reasonable-doubt standard" is unconstitutional because it "allow[s] a finding of guilt based on a degree of proof below that required by the Due Process Clause." *Cage v. Louisiana*, 498 U.S. 39, 41 (1990). A constitutionally deficient reasonable doubt instruction, as as this instruction, is not subject to harmless error analysis and requires reversal. *Sullivan v. Louisiana*, 508 U.S. 275, 279–80 (1993).

Defining reasonable doubt as a doubt which would cause a reasonable person to hesitate to act "is a formulation [which the U.S. Supreme Court] ha[s] repeatedly approved . . . [and] gives a common sense benchmark for just how substantial a doubt must be." *Victor v. Nebraska*, 511 U.S. 1, 20-21 (1994).

While the increased level of doubt (and lower burden of proof) required by the "refrain from acting" standard could rise to an unconstitutional level, the "refrain" standard requires *more* doubt – an unconstitutional level of doubt – than the

73

"hesitate" standard. Because in Petitioner's case these two standards were presented in the *alternative*, there is no way to parse whether the jury was guided by the constitutional "hesitate" standard or the unconstitutional "retrain" language. *Cf., Stromberg v. People of State of California.*, 283 U.S. 359, 367 (1931) ("If any one of these clauses, which the state court has held to be separable, was [constitutionally] invalid, it cannot be determined upon this record that the appellant was not convicted under that clause"). As a result, the trial court provided an instruction suggesting that jurors could choose the "refrain" standard over the "hesitate" standard and ignore doubts which made them merely hesitate. When presented by itself, the "refrain" standard may or may not be constitutional, but when presented in the alternative with a constitutionally acceptable standard which describes a lower level of doubt, the "refrain" standard is unconstitutional in negating that lower level.

The state courts' application of the law to this issue was unreasonable because the courts failed to consider whether phrasing the "refrain" and "hesitate" standards in the alternative could result not in the jury using both standards but selecting one and discarding the other. The PCRA court held that the instruction was constitutional taken as a whole, but instead of explaining its reasoning the court referenced the reasoning of opinions which had upheld the same instruction: *Commonwealth v. Uderra*, 862 A.2d 74, 92 (Pa. 2004) and *Commonwealth v. Romero*, 938 A.2d 362,

380 (Pa. 2007).[50]   *Commonwealth v. Bey*, No. 771 EDA 2011, at *10 (Ct. Common Pleas Phila. July 26, 2011).

The *Uderra* and *Romero* opinions noted that "the 'restraint' language has been subject to criticism" but held that, taken as a whole, the instructions were constitutional because "the trial court's charge utilized the restraint phraseology *in the disjunctive* in relation to the 'hesitate before acting' language." *Uderra*, 862 A.2d at 92; *Romero*, 938 A.2d at 380 (same). Thus, these opinions assumed that when the "hesitate" and "refrain" standards are put in the alternative jurors will consider both. The opinions did not at all address the argument, posed by Petitioner to the PCRA court, that jurors will interpret the alternative phrasing to mean they are free to select either standard.

The PCRA court should have addressed whether there was a reasonable likelihood that a juror understood the alternative phrasing as allowing jurors to select between the alternatives and ignore a doubt causing only pause or hesitation. *See Victor v. Nebraska*, 511 U.S. at 6 (*citing Estelle v. McGuire*, 502 U.S. 62, 72 & n.4 (1991)). Failing to apply this law to Petitioner's claim was unreasonable.

Trial counsel was ineffective for not recognizing that this instruction could lead

---

[50]The Superior Court on review of the PCRA opinion, held that this claim was "thoroughly, comprehensively and correctly disposed of in the [PCRA] opinion." *Commonwealth v. Bey*, No. 771 EDA 2011, at *7-8 (Super. Ct. Pa. June 1, 2012).

jurors to ignore doubts satisfying the "hesitate" standard. Counsel should have been alerted to evaluate the instruction because it contained "refrain" language which has been criticized in the past, *see Thomas*, 570 F.3d at 118; *Uderra*, 862 A.2d at 92, and is not part of the Pennsylvania model jury instruction, Pa. Suggested Std. Crim. Jury Instr. § 7.01(3) (containing only the "hesitate" standard). Once on alert, counsel should have noted not only the problem with the "refrain" language but the added problem of its effect in combination with the lesser "hesitate" standard. Because an "instructional error [which] consists of a misdescription of the burden of proof . . . vitiates *all* the jury's findings," *Sullivan*, 508 U.S. at 281, as the instruction was constitutionally deficient, counsel's allowing it to go the jury necessarily prejudiced Petitioner.

## GROUND VII

### PERVASIVE EXTRA-RECORD VOUCHING AND MISSTATEMENT OF THE EVIDENCE IN THE PROSECUTOR'S SUMMATION RENDERED PETITIONER'S TRIAL AN UNFAIR DENIAL OF DUE PROCESS

During closing argument, the prosecutor bolstered witnesses and inferences by adding to and misstating the evidentiary record. These improper statements, which dominated closing argument and obscured the lack and inconsistency of inculpatory evidence, constituted prosecutorial misconduct which deprived Petitioner of a fair trial. In addition, Petitioner's trial counsel was ineffective for not objecting

76

consistently, and the trial court erred by allowing the prosecutor to proceed after each objection.

### A.    Reference to Matters Outside the Record

To bolster police eyewitnesses during closing argument, the prosecutor improperly[51] commented on his own experience (vouching), and added evidence not provided by any witness.

First, the prosecutor opined that police are rarely eyewitnesses in murder cases and connected this rarity to the increased credibility to be given their testimony:

> The evidence in this case is clear. It is convincing and it is compelling. It is proof beyond all reasonable doubt. It is proof beyond all doubt. It is proof to an absolute moral certainty that that man, Saleem Bey, murdered Terry Swanson and tried to kill Kenneth Thompkins. This is a one in a million cases [sic]. You can go a long time in Philadelphia where there's almost 400 murders a year before you come across a case where the witnesses to the actual act of the shooting, the murder itself, are police officers.[52]    It just doesn't happen that often. It's about as

_____

[51]*See* ABA Std. § 3-5.9 ("The prosecutor should not intentionally refer to or argue on the basis of facts outside the record whether at trial or on appeal, unless such facts are matters of common public knowledge based on ordinary human experience or matters of which the court may take judicial notice."); *Commonwealth v. Randall*, 758 A.2d 669, 676 (Pa. Super. Ct. 2000) ("[I]mproper bolstering or vouching for witnesses by the Commonwealth occurs in two situations: (1) When the prosecution places the prestige of the government behind the witness by personal assurances of the witness's veracity; and (2) when the prosecution indicates that information which is not before the jury supports the witness' testimony.").

[52]Beyond bolstering the evidence, here the prosecutor misstated the evidence. There were not multiple eyewitnesses to the shooting. Only one officer, Taylor, testified that he saw the shooting. The others testified that they did not see the suspect

often as you would find a four leaf clover on the beach in the winter.

NT 12/14/05 162.5-20.

The prosecutor soon repeated, "It's a *one in a million* case where the witnesses that you're being asked to rely upon aren't civilians," *id.* at 163.17-20, and argued at length that police, generally, are better witnesses than civilians, noting:

- "the sad fact of life" that civilians "don't want to get involved" or "stick their necks out" because "[the murder] doesn't concern them," *id.* at 163.21-164.13;

- that police officers are trained observers,[53] comparing them to firefighters who "have the training and experience and the equipment to go into the fire," *id.* at 163.14-165.8, 170.3-172.19;

until later when Taylor was chasing after him.

[53]The prosecutor also argued at length that Officer Taylor was an even better observer because he "is a blue collar cop" and a military member. NT 12/14/05 170.8-172.18. ("He's not just a cop; he's got military training. He went through basic training, infantry training, training in live fire simulated combat. He's in the Reserves. He's used to being around gunfire and guns because he's a soldier, in addition to being a cop, and all of that training and experience kicked in on the night of this shooting. If I was out there, if you were out there and something like this happened, we'd be those people who would be leaving, ducking behind cars and hiding. But there was one person out there who went forward with one objective only, find the shooter, find the gun. That's it. That's his No. 1 job that night. Anybody disagree with that? . . . He can't afford to make the mistake that [defense counsel] claims he made. He can't afford to do it because it can cost him his life."). Beyond exceeding the record in describing Officer Taylor's qualifications and thought processes, it was misconduct for the prosecutor to bolster the witness by reference to his military background. Defense counsel did not argue that Taylor missed the shooting because he had cowered and fled. The prejudice of appealing to jurors' sympathies outweighed any minimal probative value of rebutting an argument that was never made.

78

- that "unlike civilian witnesses that might have seen this," police officers were not under the influence of drugs or alcohol, *id.* at 165.9-18; and that

- police officers were unbiased in that they did not care whether Petitioner was convicted, had no motive to lie because "[t]hey were [just] doing the job," and "unlike most civilian witnesses, [were] completely objective and completely impartial," *id.* at 167.8-169.20.

In total, the prosecutor spent the first eleven pages of summation arguing outside the evidentiary record that police officers are superior witnesses.

Moreover, during this portion of the argument, the prosecutor added the weight of his own professional experience, which of course was outside of the record of the trial:

> [I]t's unusual to have a case like a murder case, especially, that turns on the testimony of just police officers. *I've been doing this, folks, for 18 years and I've only had one other one* where the police officers were the eyewitnesses[54] to the murder, because it doesn't happen that often. It's a one in a million case.

*Id.* at 166.10-17.

There was no testimony about the frequency of having police as eyewitnesses in Philadelphia murder cases, the general strengths and weaknesses of police and civilian eyewitnesses, whether every potential civilian eyewitness to the shooting was

---

[54]Again, the prosecutor incorrectly told the jury that there were multiple eyewitnesses to the shooting.

79

intoxicated, or the "sad facts of life" in Philadelphia.  Moreover, it was improper to suggest that police officers are credible because the nature of their job is to objectively observe and report.[55] The prosecutor's extra-record statements about the unique quality of police eyewitnesses improperly bolstered the Commonwealth's witnesses, rationalized the lack of civilian witnesses, and suggested to jurors that finding Petitioner not guilty would ruin a "one in a million" case.

In addition to bolstering police witnesses, the prosecutor added evidence of his own experience or "common knowledge" about murder cases to make inferences not supported by the evidence.

First, responding to defense counsel's argument that if Petitioner were the shooter, he would not have run straight at police officers but instead turned and fled, the prosecutor explained, "He doesn't notice them. He's so focused on what he's

---

[55]*See, e.g. United States v. Aguilar*, 645 F.3d 319, 324-26 (5th Cir. 2011) (holding that prosecutor's comment "they go out there every day and do their job . . . [only] to come to the courtroom and be called a liar," was an improper emotional appeal that agents would not lie because they are government agents and holding that such error affected the defendant's substantial rights where "there was little inculpatory evidence other than the agents' testimony."); *United States v. McCann*, 613 F.3d 486 (5th Cir. 2010) (holding the prosecutor's comment, "I think there is a need to apologize, to apologize to [the police] officers who wear bulletproof vests because they have to worry about getting shot at on the street and then they come in here in court and they get shot at again ... [t]hey came in here and testified about what they did ... [a]nd then because the defendant is caught red-handed, they get call [sic] liars," was "a largely emotional appeal to the jury to credit the arresting officers' testimony because they were police officers.").

trying to do. *That's how these things happen.*" *Id.* at 199.4-8. Thus, to support speculation on Petitioner's thought process while running toward police, the prosecutor added the weight of his own experience in criminal cases.

Second, to argue that money motivated the shooting,[56] the prosecutor asked rhetorically, *"Do you have any idea how many people in Philadelphia get murdered in Philadelphia [sic] every year for money?" Id.* at 218.8-10.  No evidence was produced at trial about the frequency of murder-robberies or that the shooter had tried to rob either of the victims.

### B.    Misstatement of the Evidence

Like asserting facts outside the record, it is improper[57] for counsel to misrepresent facts in the record.

---

[56]This was one of two motives the prosecutor proposed for the shooting. The other was neighborhood violence. NT 12/14/05 217.14-15 ("The first motive is money."), 218.11-14 ("But there's another motive here and I've touched upon it. Saleem Bey, South Philly; Terry Swanson, South Philly; Kenny Thompkins, South Philly; the gun, South Philly.").

[57]*See Washington v. Hofbauer*, 228 F.3d 689, 700 (6th Cir. 2000) (*citing Donnelly*, 416 U.S. at 646); ABA Std. Crim. Just. § 3-5.8(a) ("In closing argument to the jury, the prosecutor may argue all reasonable inferences from evidence in the record. The prosecutor should not intentionally misstate the evidence or mislead the jury as to the inferences it may draw."); Model R. Prof'l Conduct R. 3.3(a)(1) ("A lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal."). Moreover, misstating facts "h[o]ld[s] an even greater potential for misleading the jury" when the misstated evidence is central to the prosecution's case. *United States v. Carter*, 236 F.3d 777, 785-86 (6th Cir. 2001).

In Petitioner's case, the prosecutor inaccurately restated evidence to obscure unfavorable testimony.

First, in explaining why police failed to test Petitioner for gunpowder residue, the prosecutor incorrectly stated that contamination affirmatively existed, which would make the test futile: "*There is a problem* with the gunshot residue test and the issue of contamination . . . . *There's a problem* with contamination. . . . [Officers] had their guns in their hands as they were chasing him through the parking lot. Every one of them did. *Their guns have gunshot residue on them.*" *Id.* at 221.24-223.3.   No witness testified that officers' guns had gunpowder residue on them or that contamination affirmatively existed. No witness testified that a gunshot residue test cannot be performed on a shooting suspect who is apprehended by police with drawn weapons. Detective Wilson testified that the gunpowder residue test was not performed "to protect [Petitioner's] rights" because of the *possibility* of contamination. NT 12/12/05 209.3.   However, Wilson also testified that the gunpowder residue test had been performed in the past on shooting suspects in Petitioner's same circumstances. NT 12/13/05 37.21-38.25. The prosecutor improperly bolstered Wilson's dubious explanation by adding facts outside the record to change the nature of the explanation.[58]

---

[58]This misstatement compounded the confusion created by the trial court earlier telling jurors that a gunpowder residue test *was* performed but came back negative

Second, to argue that the Officer Taylor's testimony was consistent with his seeing Kenneth Thompkins (not Terry Swanson) get shot, the prosecutor misstated evidence on gunshot-wound locations and Taylor's testimony. First, he argued that Taylor might have thought he saw Swanson get shot because both victims were shot in the back of the head. *Id.* at 193.4-8 ("Both Terry Swanson and Kenneth Thompkins were black males. They were dressed identical. They even had boots and white shirts on. They were both shot in the back of the head area."); 196.6-10 ("[N]ow we know that both males were shot in the same parking lot with the exact same gun, both dressed the exact same way, both shot in the back of the head. Both of them."). No evidence suggested that Thompkins was shot in the back of the head.[59] Inconsistently, the prosecutor, at one point,[60] recounted Taylor's testimony as stating that the victim whom he saw was shot in the back (not the head). *Id.* at 173.16-21 ("And [Taylor] tells [his fellow officers] and each and every one of them came in and told you he told

_____

because of another form of contamination: rubbing off during arrest, transportation, and processing. NT 12/12/05 208.5-11.

[59]The only testimony on where Thompkins was shot came from Thompkins' own testimony, in which he stated that he had been shot four times: in the back, neck, shoulder, and elbow.  NT 12/13/05 55.2-19. Taylor did state during cross-examination that both witnesses were shot in the back of the head, but he provided no evidence of this fact. NT 12/9/2005 139.24-141.20, 146.5-17.

[60]At other points in closing argument, the prosecutor correctly recounted Taylor's testimony as stating that he saw the second victim get shot in the back of the head.

them I saw that man with a gun shoot another man in the parking lot in the *back*. That's a fact. There was a man shot in that parking lot in the back.").

By misstating where Thompkins was shot and vacillating on Taylor's testimony about where on the victim's body he saw get shot, the prosecutor elided a glaring inconsistency in the identification testimony. These misstatements on the key issue at trial, Taylor's observation of the shooting, were severe enough alone to deprive Petitioner of due process.

### C.    Constitutional Errors

The prosecutor's misconduct via improper vouching and misstatement of the evidence is governed by the same standards described in Claim I (on prosecutorial misconduct via improper introduction of prejudicial information about witness intimidation and unrelated murders). Errors which "so infect [a] trial with unfairness" deny a defendant due process. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); ; *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Unfairness is assessed by looking at (1) the severity of the conduct, (2) the effect of curative instructions, and (3) the quantum of evidence against the defendant. *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001).

Improper vouching and misstatement of the evidence was severe and pervasive. The prosecutor began summation by lengthy extra-record argument about the

84

superiority of police officer eyewitnesses. Throughout the summation, the prosecutor invented and misstated evidence in response to evidentiary weaknesses, including on the key issue of eyewitness testimony about the shooting.

Though at times during summation, the trial court instructed jurors that the prosecutor's statements were not evidence and their own recollection controlled,[61] these instructions were insufficient to cure the severe error. First, the instructions did not tell jurors that the prosecutor's comments were improper and almost none of the instructions told jurors to ignore the offending comment. Most instructions only told jurors that their own recollection controlled. However, this instruction was insufficient to ensure that jurors did not refresh their own recollections with the prosecutor's improper summation. Second, instructions were not provided consistently with each improper comment,[62] and the prosecutor often ignored the

_____

[61]NT 12/14/05 177.1-5 (in response to an objection that the prosecutor misstated that Taylor's first opportunity to testify was the 2004 trial, arguing that it was the 2001 preliminary hearing; as there was a definite answer to this issue, this was an odd instruction); 190.16-20 (in response to an objection that the prosecutor's narration of the events before the shooting went beyond the record); 226.7-12 (in response to an objection that the prosecutor was improperly testifying about how gunpowder residue test are performed); 233.2-3 (in response to an objection that the prosecutor improperly commented on Petitioner's failure to produce exculpatory evidence before trial); 236.22-237.6 (same).

[62]No instruction was given (1) during the eleven-page improper comment on the rarity and quality of police eyewitnesses, (2) when the prosecutor used his own experience to bolster inferences about motive and Petitioner's thought process during the shooting, (3) when the prosecutor misstated Taylor's identification testimony and

warning and continued making the improper point.[63] Finally, even properly phrased, timely, and heeded cautionary instructions cannot cure severe error. *See Moore*, 255 F.3d at 115-16, 118-19 ("We believe the trial court properly attempted to cure any resulting prejudice from the prosecutor's arguments. As noted, its instructions directly charged the jury to disregard the prosecutor's improper references to race and appeals to their emotions. Despite the trial court's strong instructions . . . . we believe a reasonable application of Supreme Court precedent requires finding Moore's trial was so infected with unfairness that it was constitutionally infirm); *Hassine v. Zimmerman*, 160 F.3d 941, 948-49 (3d Cir. 1998) (holding that the prosecutor violated defendant's right to due process by asking three times why he had not come forward with exculpatory evidence before trial, even though the court sustained objections after each question).

Improper comments dominated summation, as there was little inculpatory evidence for the prosecutor to discuss: one police eyewitness with inconsistent

_____

the location of Thompkins' gunshot wounds, or (4) when the prosecutor invented a reason why the gunpowder residue test was not performed on Petitioner. In other words, though improper vouching and misstatement of the evidence pervaded the trial and occasionally drew objection, the key errors described above did not receive cautionary instructions of any kind.

[63]The very nature of the instruction, that the jurors' recollection controlled, allowed the prosecutor to continue inventing and misstating evidence in an attempt to shape jurors' recollection.

testimony, several officers who saw this first officer chasing Petitioner after the fact, and no physical or forensic evidence inculpating Petitioner. Especially in a case with consequences for the defendant as serious as a murder prosecution,[64] due process requires that the prosecution's summation should stand on the facts produced by the witnesses, not add to or obscure them. Accordingly, the prosecutor's addition of extra-record evidence and misstatement of the evidentiary record was a due process violation in itself, and combined with other instances of prosecutorial misconduct discussed elsewhere in this *Petition*.

**GROUND VIII**

### DEFENSE COUNSEL WAS INEFFECTIVE FOR ARGUING THAT PETITIONER FLED FROM POLICE BECAUSE HE POSSESSED OF ONE OF THE GUNS FOUND AT THE CRIME SCENE

During closing argument, Petitioner's trial counsel suggested to jurors that Petitioner was running from police because he was in illegal possession of a weapon, though not the murder weapon:

> Why is he attempting to get away from the police if he didn't do anything wrong? Because maybe he has a Derringer in his pocket. You heard from the officer that, in fact, you saw him throw it. And you heard when I asked Officer Ferrero don't police oftentimes, people have a gun illegally, they may run from the police? He said all the time. All the time. So Saleem Bey, being out there, having this Derringer illegally in his pocket, confusion runs amok, sees police officers, runs behind here

---

[64]*See* 18 Pa. C.S. § 1102 (providing that the penalty for first-degree murder is death or a term of life imprisonment).

and tries to get rid of this, but never, according to Sergeant Walton, never according to all the others in the case, does anything consistent with [possessing] that murder weapon at all. That could have happened.

NT 12/14/05 126.8-25.

This argument was completely unnecessary and ran counter to Petitioner's outright denial of any wrongdoing.

There was no sound strategy for trial counsel to place a gun on Petitioner to explain why Petitioner was running from police. Witnesses testified that after shots began to ring out, everyone in the parking lot began to run. NT 12/9/05 69.14-17 (Taylor); NT 12/12/05 54.21-55.2 (Ferrero); *Id.* at 124.8 (Walton, describing a collision with another man while chasing the suspect). Witnesses also testified that Officer Taylor was chasing after Petitioner and shouting to other officers that he was the shooter. NT 12/9/05 78.19-24 (Taylor); NT 12/12/05 16.7-17.5 (Ferrero); *Id.* at 119.10-14 (Walton). Thus, trial counsel could have argued that Petitioner was running because he had been misidentified by police during the frenzy of a shooting in a crowded parking lot. Alternatively, trial counsel could have provided no explanation for Petitioner's running, focusing instead on the weakness of the direct evidence that Petitioner was the shooter. Counsel's attempt to explain the circumstantial evidence only bolstered it, as "admitting" that Petitioner possessed a weapon enabled the inference that anyone with a weapon at the scene of a shooting

88

had to be involved.[65]

The PCRA court ruled that trial counsel's strategy with respect to the Derringer "was reasonable in light of [the overwhelming evidence[66]]." *TCO* at *12-14. This ruling was an unreasonable application of the law to the facts of Petitioner's case because, as discussed in previous claims, the evidence against Petitioner was not overwhelming. The evidence's weakness also allows Petitioner to establish prejudice. Given the weakness of eyewitness evidence of the shooter's identity (and the absence of any physical evidence identifying the shooter), there is a reasonable probability that the jury convicted Petitioner because trial counsel's admission bolstered the circumstantial evidence.

---

[65]Indeed, the prosecutor suggested that Petitioner's possession of the Derringer bore on his guilt:

> He dumped another gun, which they now admit he did have. They'll take this one but they are not taking that murder weapon."  NT 12/14/05 210.12-14.

> Do you know how much of a big non-issue [not performing a gunpowder residue test] is? What did Mr. McMahon do just moments ago when he stood up and made his closing argument to you? He admitted his client was holding a gun. *Id.* at 225.7-11.

[66]This is the equivalent of ruling that trial counsel's performance was not "deficient" under *Strickland v. Washington*, 466 U.S. 668 (1984).

89

## GROUND IX

### THE TRIAL COURT'S MISSTATING AND DISTORTING EVIDENCE IN FAVOR OF THE PROSECUTION DEPRIVED PETITIONER OF DUE PROCESS

A trial judge "may not either distort . . . or add to [the evidence]." *Quercia v. United States*, 289 U.S. 466, 470 (1933).  When a trial judge does so in a criminal case, due process is violated.  *Bracy v. Gramley*, 520 U.S. 899, 904 (1997) ("the floor established by the Due Process Clause clearly requires a fair trial in a fair tribunal, before a judge with no actual bias against the defendant or interest in the outcome of his particular case.") (internal citations and quotation marks omitted).

In "determin[ing] whether the trial judge's comments have pervaded the overall fairness of the proceeding," depriving the defendant of due process, the court should assess whether "'the judge's role loses its color of neutrality and tends to emphasize the prosecution's case." *United States v. Wilensky*, 757 F.2d 594, 598 (3d Cir. 1985) (*citing United States v. Bland*, 697 F.2d 262, 265 (8th Cir. 1983)). Even a "slight[] indication that [the judge] favors the government's case can have an immeasurable effect upon a jury." *Bland*, 697 F.2d at 265-66; *see also Quercia*, 289 U.S. at 470 ("The influence of the trial judge on the jury is necessarily and properly of great weight and his lightest word or intimation is received with deference, and may prove controlling.").

90

In Petitioner's case, the trial court's comments reflected a lack of neutrality and thus improperly bolstered the prosecution's case.

First, the trial court bolstered police witnesses against the defense contention that the police did not conduct a thorough and proper investigation. Cross-examining Detective Charles Boyle, defense counsel elicited testimony that Boyle arrested Kenneth Thompkins on a bench warrant, took him to a meeting with the prosecutor, and returned him home without bringing him before the judge as the bench warrant instructed. NT 12/13/05 160.14-163.19. When asked why he did not follow the bench warrant's instruction, Boyle responded, "I used my discretion and if it was wrong, I'll answer to the judge for that." *Id.* at 163.18-19. During re-direct, defense counsel objected to the prosecutor's suggestion that Boyle had followed instructions, and the trial court responded:

> I'm going to tell the jury right now no contempt was ever brought before me for him not showing up. It just didn't happen. And why it didn't happen is this officer used his own discretion, according to his testimony, and I would not hold *him* in contempt for not doing that because the witness is here today and that's all I wanted.

NT 12/13/05 168.9-17.

Thus, the judge frustrated defense counsel's argument that police did not follow instructions, even though this was a fact established by the evidence. Whether or not Boyle faced sanction for not following instructions was another matter,

91

extraneous to the case. In taking sides with Boyle and endorsing his "used my discretion" language, the trial court colored jurors' assessment of police witnesses. Doing so was especially egregious in a case in which the prosecution's only evidence was the word of police witnesses.

Second, the trial court showed partiality toward police witnesses in inaccurately summarizing Detective Avon Wilson's testimony about the gunpowder-residue test. On direct examination, Wilson testified that the test was not performed on Petitioner.  NT 12/12/05 206.11. Wilson explained that the test was not performed because Petitioner's hands were not immediately bagged and, therefore, he could have been contaminated with gunpowder residue while police handled him.  *Id.* at 206.13-207.3.  After an objection and extended argument, the trial court tried to settle the issue of the gunpowder-residue test in favor of the prosecution – but going well beyond Wilson's testimony – asking Wilson, "Based on your experience there was nothing found here, because of other intervening things such as people touching them, people handcuffing him, and sitting in a chair and so forth. Is that what you're saying?" *Id.* at 208.5-10.  Wilson, inexplicably, responded to this grossly inaccurate summary of his testimony, with  "Yes, sir." *Id.* at 208.11.

Thus, while Wilson testified that he had *not* run the test and explained that, if run, it *might* have come back positive due to police handling, the trial court went two

steps further and told jurors that the test *had* been run and came back negative *because* of police handling. Detective Wilson, the prosecution's forensic expert, was quick to endorse the trial court's explanation. Even if the trial court's mistake was unintentional, it shows a willingness to presume police competence without scrutinizing the evidence.

### Exhaustion

This obvious violation of Petitioner's right to due process of law was not objected to by trial counsel, nor was it – or trial counsel's failure to object to this instruction –  raised on direct appeal or by initial PCRA counsel.

Petitioner submits that there is no longer an available remedy to exhaust these claims in state court, and therefore the claims are arguably procedurally defaulted. Petitioner submits that initial PCRA counsel's ineffectiveness for failing to raise this obvious flaw in the instructions and trial counsel's ineffective failure to object, will provide cause to overcome any bar raised by the Commonwealth.

### GROUND X

### TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE AND PREPARE CHARACTER WITNESSES

Defense counsel presented only character witnesses, and his investigation and preparation of them was grossly deficient. Defense counsel noted on the record that

he had not even considered character witnesses until the night before, five days into the trial, and that he had not had time to prepare them in advance:

> I need some time because I wasn't sure – this issue of character evidence, to be honest with you . . . the defendant called me last night, I received a cell phone call from him through his mother. I don't know if it was his mother but somebody, and they brought up this concept of character evidence to me and, you know, I started to think about it.

*Id.* at 33.6-15.

During trial, defense counsel asked each character witness only two questions about Petitioner: (1) whether they had spoken with other people about Petitioner's reputation for nonviolence, and (2) what that reputation was. *Id.* at 46.19 (Najah Briley), 51.11 (Donald Stokes), 56.13 (Tynetta Bey), 60.12 (Cherita Williams), 63.25 (Rashid Bey), 67.22 (Ladon Carr). The prosecution's cross-examination was largely successful in eliciting from each character witnesses that they could not recall *specific* conversations about Petitioner's reputation for nonviolence. Given that defense counsel asked each witness only two questions about Petitioner, he was ineffective for not preparing them—or not having time to prepare them in the minutes before presenting these six witnesses—to be able to give an actual example of one of two questions he asked.

Obviously, had counsel spent any time at all investigating and preparing these witnesses, he could have elicited from them the basis for their character testimony.

94

Character evidence alone may raise a reasonable doubt, *see Commonwealth v. Weiss*, 606 A.2d 439, 442 (Pa. 1992) ("Evidence of good character is substantive, not mere makeweight evidence, and may, in and of itself, create a reasonable doubt of guilt and, thus, require a verdict of not guilty.") (*citing Commonwealth v. Neely*, 561 A.2d 1 (Pa. 1989)); *see also* Pa. Suggested Std. Crim. Jury Instrs. § 3.06(3) ("The law recognizes that a person of good character is not likely to commit a crime that is contrary to that person's nature. Evidence of good character may by itself raise a reasonable doubt of guilt and require a verdict of not guilty."). This instruction was given to the jury. NT 12/15/05 14.9-11.

Accordingly, counsel's abject failure to prepare for this important phase of the trial caused Petitioner's prejudice.

**Exhaustion**

This obvious instance of trial counsel ineffectiveness was ineffectively not raised by initial PCRA counsel.  Petitioner submits that there is no longer an available remedy to exhaust these claims in state court, and therefore the claims are arguably procedurally defaulted.   Petitioner further submits that initial PCRA counsel's ineffectiveness for failing to raise this obvious flaw in the instructions and trial counsel's ineffective failure to object, will provide cause to overcome any bar raised by the Commonwealth.

95

**REQUEST FOR RELIEF**

Based on all of the above and the entire state court record in this matter,

Petitioner respectfully requests the following relief:

      A.      That Respondents be required to answer the Petition;

      B.      That Petitioner be permitted to reply to the answer;

      C.      That Petitioner be afforded discovery and an evidentiary hearing; and

      D.      That the Court grant the Writ of Habeas Corpus.

Respectfully Submitted,


Michael Wiseman
Post Office Box 120
Swarthmore, PA 19081
215-450-0903
Wiseman_Law@Comcast.Net
Counsel for Petitioner
Saleem Bey

Dated:      Swarthmore, PA
              October 4, 2013

96

## Certificate of Service

I, Michael Wiseman, hereby certify that on this 4th day of October 2013, I served a copy of the foregoing upon the following person in the manner indicated:

Thomas Dolgenos, Esq.
Chief, Federal Litigation Unit
Office of the Philadelphia District Attorney
3 Penn Square South
Philadelphia, PA 19107
**By U.S. Mail**


_____
Michael Wiseman