UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____ :
:
Saleem Bey, :
: Docket Number
Petitioner, : 13-cv-5848
:
v. :
: Hon. Anita B. Brody
: United States District Judge
Louis Folino, et al., : Hon. Timothy R. Rice
: United States Magistrate-Judge
Respondents. :
_____ :


**PETITIONER'S REPLY MEMORANDUM
IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS**

Law Office of Michael Wiseman
Michael Wiseman
Benjamin Marshal
Post Office Box 120
Swarthmore, Pennsylvania 19081
215-450-0903
Wiseman_Law@Comcast.Net
Counsel for Petitioner

Dated:      August 7, 2014
            Swarthmore, PA

PRELIMINARY STATEMENT

Pending before the Court is Saleem Bey's *Petition for a Writ of Habeas Corpus* filed October 4, 2013.  It will be referred to as *Petition* and cited at *Pet.*

The *Petition* was referred to the Magistrate-Judge on October 31, 2014, for a *Report and Recommendation*.

On November 8, 2013, Respondents, represented by the Philadelphia District Attorney, were directed to respond.  The Commonwealth's *Response to the Petition for Writ of Habeas Corpus* was filed May 13, 2014.  It will be referred to as *Commonwealth's Response* and cited as *CR*.

Petitioner requested and received extensions of time until August 7, 2014, to file the instant *Reply*.

The form of citations used in the *Petition* are as follows:

- transcripts of the state court proceedings ("Notes of Testimony") will be cited as "NT" followed by the date of the proceeding and page citations;

- two relevant unpublished opinions issued by the Pennsylvania Superior Court, *Commonwealth v. Bey*, 1864 EDA 2006 (May 12, 2008) (direct-appeal opinion); *Commonwealth v. Bey*, 771 EDA 2011 (June 1, 2012) (post-conviction opinion), will be cited as

*Bey 1* and *Bey 2*, respectively; and

- the post-conviction opinion issued by the trial court, *Commonwealth v. Bey*, CP-51-CR-1206691-2001, CP-51-CR-1209051-2001 (Ct.Com. Pl.-Phila. July 26, 2011), will be cited as *TCO-PCRA*, followed by a page reference to the slip opinion.

The trial court issued an opinion during the direct appeal which was not referenced in the *Petition* but is referenced in this *Reply*. *Commonwealth v. Bey*, CP-51-CR-1206691-2001, CP-51-CR-1209051-2001 (Ct. Com. Pl.-Phila. May 8, 2007). It will be cited as *TCO-Direct*.

All emphasis is added unless otherwise indicated.  Parallel citations are omitted.  All other citations are self-explanatory or are explained.

ii

# TABLE OF CONTENTS

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Table of Contents  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Each Ground for Relief is Reviewable as it Was Either Fairly Presented
to the State Courts, or, if Not So Presented, Petitioner Demonstrates
Cause and Prejudice for the Failure to Do So . . . . . . . . . . . . . . . . . . . . . . . . .  2

The Need for An Evidentiary Hearing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

Ground I      Improper  Evidence  and  Argument  on  Threats and
              Unrelated Murders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

    A.      Trial Counsel Ineffectively Litigated Admission of Extraneous
              Violence References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

        1.      Ineffectiveness During the *Motion in Limine*  . . . . . . . . . . . . .  9

        2.      Ineffectiveness During Testimony and Argument . . . . . . . . .  10

    B.      The Commonwealth's Arguments  . . . . . . . . . . . . . . . . . . . . . . . .  13

Ground II     The Identification Instructions  . . . . . . . . . . . . . . . . . . . . . . . . . .  17

Ground III    The *Batson* Violation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

Ground IV     The Doyle-Carter Violations  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

    A.      Merits  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

    B.      Procedural Default  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

        1.      Comment on Post-Arrest Silence (Doyle)  . . . . . . . . . . . . . .  29

        2.      Comment on Silence at Trial (Carter)  . . . . . . . . . . . . . . . . .  30

iii

Ground V    Trial, Direct Appeal and PCRA Counsel Ineffectively
            Failed to Object to the Court's Incomplete Instruction on
            Petitioner's Right to Remain Silent  . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

       A.   Merits  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

       B.   Procedural Default  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Ground VI   The Trial Court Erred in Providing a Reasonable-Doubt
            Instruction Suggesting to Jurors that they Could Ignore
            Doubts Causing Hesitation in Matters of the Highest
            Importance  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Ground VII Prosecutorial Vouching and Misstatement of Evidence . . . . . . . . . . 35

       A.   Merits  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

       B.   Procedural Default  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Ground VIII Ineffective Argument that Petitioner Possessed a Weapon . . . . . . . 38

Ground IX   Trial Court Misstatement and Distortion of Evidence . . . . . . . . . . . 40

       A.   Merits  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

       B.   Procedural Default  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Ground X    Ineffective Investigation and Preparation of Character
            Witnesses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

       A.   Merits  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

       B.   Procedural Default  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

## INTRODUCTION

The Commonwealth's *Response* begins with nine pages presenting the facts of the case in the light most favorable to Commonwealth, omitting evidentiary inconsistencies and deficiencies which were before the jury and are noted in the *Petition*. Review of the record in each instance will confirm such evidentiary weaknesses. As argued in the *Petition*, and contrary to the Commonwealth's assertion that this is a simple case with an unassailable police eyewitness, this was far from an overwhelming case. Rather – as detailed in the *Petition* – the scene was confused, the eyewitness evidence inconsistent, and the investigation deficient. Just as the prosecutor did at trial, the Commonwealth seeks to obscure evidentiary gaps by impugning defense counsel and, more importantly, by injecting unrelated killings into its *Response*.

Petitioner will first address the overarching procedural question relevant to a majority of the grounds for relief presented in the *Petition*, namely, that he is entitled to merits review of even unexhausted claims owing to the ineffective assistance of initial state post-conviction counsel.

He next addresses the need for this Court to conduct an evidentiary hearing on the issues of trial and initial post-conviction counsel ineffectiveness.

Finally, he addresses each ground on the merits, as well as any related procedural questions.

1

**EACH GROUND FOR RELIEF IS REVIEWABLE AS IT WAS EITHER FAIRLY PRESENTED TO THE STATE COURTS, OR, IF NOT SO PRESENTED, PETITIONER DEMONSTRATES CAUSE AND PREJUDICE FOR THE FAILURE TO DO SO**

The Commonwealth argues that several of Petitioner's claims, or portions thereof, are not exhausted. Because no avenue remains to present them to the state courts, these claims are procedurally defaulted. At length, the Commonwealth explains the law of exhaustion and procedural default, with which Petitioner has no material quarrel. *CR*, 70-80. Within this explanation, however, the Commonwealth minimizes the "causes" which the Supreme Court has held that a habeas petitioner may show to excuse procedural default. *CR*, 78-79. Only in a footnote does the Commonwealth acknowledge that Petitioner may show "cause" for procedural default by the ineffectiveness of counsel in initial-review collateral proceedings (*i.e.* PCRA proceedings) in failing to raise claims of trial-counsel ineffectiveness. *Id.*, 79, n. 26 (*citing Martinez v. Ryan*, 132 S. Ct. 1309 (2012)).[1]

To refute that Petitioner is entitled to merits review of unexhausted/defaulted

---

[1]Each ground for relief in the *Petition* contains a claim of trial-counsel ineffectiveness. To make the titles and table of contents a more manageable size, some grounds were phrased in terms of the overall error by the prosecutor and/or trial court and omitted the parallel ineffective assistance of counsel issue (*i.e.* failing to object to or adequately litigate the prosecutor or trial court's error). In a "Procedural Default" section in each Ground addressed below, Petitioner identifies how the *Petition* raises ineffective assistance of trial counsel for that Ground.

claims under *Martinez*, the Commonwealth notes that under *Martinez* the petitioner "must show that he had no meaningful opportunity to raise this trial counsel ineffectiveness claim in state court [and that] the challenge to trial counsel's performance is 'substantial.'" *Id.* (*citing Martinez*, 132 S. Ct. at 1319). The Commonwealth then asserts conclusorily that Petitioner had such an opportunity and that his claims are not substantial: "He did have a meaningful opportunity to challenge Jack McMahon's performance in state court, and none of his defaulted trial counsel ineffectiveness claims are substantial." *Id.*

This is incorrect. Petitioner did not have a meaningful opportunity to raise trial-counsel ineffectiveness claims **before initial PCRA proceedings**. Under *Trevino v. Thaler*, 131 S. Ct. 1911, 1918 (2013), a petitioner may show cause under *Martinez* even if the state does not absolutely bar ineffective assistance claims during direct appeal. Rather, there is no meaningful opportunity to raise ineffectiveness claims before post-conviction proceedings if (1) court procedures make it "virtually impossible" to raise such claims on direct review by requiring direct-appeal filings before the record is developed enough to present such claims, and (2) state-court opinions "have directed defendants to raise claims of ineffective assistance of trial counsel on collateral, rather than on direct, review." *Id.*, 1918-20. This is the case in Pennsylvania. *See Commonwealth v. Grant*, 813 A.2d 726, 738 (Pa. 2002) ("We now

3

hold that, as a general rule, a petitioner should wait to raise claims of ineffective assistance of trial counsel until collateral review"); *Commonwealth v. Holmes*, 79 A.3d 562, 583 (Pa. 2013) ("As a result of the terms of the PCRA, limitations on the power of counsel to accuse himself of ineffectiveness, and a case such as *Grant*, which was powered in part by fidelity to the approach to ineffectiveness claims directed by the PCRA, claims of ineffective assistance of trial counsel in Pennsylvania generally are deferred to PCRA review and generally are not available on direct appeal."); *see also Pa. R. App. P.* 1925(b) (trial judge may order a statement of errors complained of on appeal and failure to include issues constitutes waiver, and must permit an appellant at least 21 days to file – this time may be extended for "good cause shown" – such a truncated time frame making it virtually impossible to raise extra-record claims of ineffective assistance of counsel). Indeed, Petitioner tried raising trial-counsel ineffectiveness claims during direct appeal, and the trial court dismissed them, citing *Grant*. *TCO-Direct*, 6.

Thus, the "cause" articulated in *Martinez/Thaler* exists on the face of the Pennsylvania scheme for adjudicating ineffectiveness claims. *See also Stanley v. Fisher,* No. 11-3040, 2013 WL 6632531, at *3, n.1 (E.D. Pa. Dec. 17, 2013) (applying *Martinez* and *Trevino* to a Pennsylvania habeas petitioner post-*Grant*).

4

### THE NEED FOR AN EVIDENTIARY HEARING

Sprinkled throughout its *Response* the Commonwealth offers ostensible reasons for why trial counsel or initial post-conviction counsel took particular actions, or refrained from still others. *See e.g. CR* 22, n.12 (speculating that trial counsel did not object to *Kloiber* instruction because he thought court might withdraw instruction entirely); *CR*, 38 (speculating that initial PCRA Counsel, Gelman, winnowed the claim of IAC in trial counsel arguing that Petitioner possessed a firearm); *CR*, 42 (proposing trial counsel strategy in waiting until the last moment to prepare character witnesses).

Whether counsel's acts or omissions were motivated by a particular tactical consideration is a question of fact. *Berryman v. Morton*, 100 F3d 1089, 1095 (3d Cir. 1996). Thus, as the state courts never afforded Petitioner a hearing on his claims of trial counsel ineffectiveness, and this Court must explore the basis for initial post-conviction counsel's acts or omissions as they relate to cause for any default, this Court must conduct an evidentiary hearing on counsel-alleged reasons. It may not simply accept the Commonwealth's speculation as to the reasons for particular actions or omissions of either trial or initial post-conviction counsel. *See Thomas v. Varner*, 428 F.3d 491, 504, n.7 (3d Cir. 2005) ("We believe that an inquiry into whether counsel actually had some strategy is permissible. *Cf. United States v.*

*McCoy*, 410 F.3d 124, 135 (3d Cir. 2005) (stating, in a 28 U.S.C. § 2255 case, that '[w]ithout the opportunity to evaluate the rationale given by trial counsel, the issue of possible ineffectiveness cannot be conclusively determined.'). Otherwise, incompetency of defense counsel could be rewarded by ingenuity on the part of a State's attorneys in supplying hypothetical strategies to explain defense counsel's uninformed prejudicial oversights.").[2]

───────────────

[2]*See also Jaynes v. Grace*, 442 F. App'x 645, 648-49 (3d Cir. 2011) (*not precedential*):

> [Counsel's] conduct is "reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." A "defendant can rebut this 'weak' presumption by showing either that the conduct was not, in fact, part of a strategy or by showing that the strategy employed was unsound." *Thomas,* 428 F.3d at 499–500 (footnote omitted). In regard to the former approach, we have explicitly noted "that an inquiry into whether counsel actually had some strategy is permissible." *Id.* at 499 n. 7. Such an inquiry seems particularly appropriate in a case such as this, in which the record discloses little and that virtual silence is attributable neither "to lack of diligence on the part of the petitioner [n]or ... to the unavailability of counsel," *id.* at 500, but rather to the frustration of petitioner's attempts to develop the requisite facts. Indeed, the record before this Court only casts doubt on [counsel]'s decision not to provide notice of an alibi or call Wing as a witness at trial. . . . The District Court does not appear to have previously considered the necessity of an evidentiary hearing, at least not explicitly.

## GROUND I

### IMPROPER EVIDENCE AND ARGUMENT ON THREATS AND UNRELATED MURDERS

Ground I of the *Petition* sets forth a catalog of trial references to extraneous violence and the reasons why their admission was improper and deprived Petitioner of a fair trial – they were irrelevant, overly prejudicial, largely hearsay, and constituted a pattern of prosecutorial misconduct. The Commonwealth's main response is that this presentation is "confusing" and "intertwines exhausted and defaulted [claims]." *CR*, 19. However, the claims were grouped together (a) to present a coherent picture of the errors, and (b) because all unexhausted aspects are nevertheless reviewable under the *Martinez-Trevino* rubric of ineffective assistance of trial counsel, because of initial post-conviction counsel's ineffective litigation of them.

Trial counsel ineffectively failed to exclude or limit extraneous-violence references by repeatedly ignoring viable objections. If post-conviction counsel raised only one instance of trial counsel's failure to object,[3] this, too, was ineffective

---

[3] Although the title of the claim in the PCRA brief refers only to Mosely's comment about "six other murders," *see Post Conviction Relief Act Petition* (date stamped October, 13, 2009) at 9, the claim itself notes other improper questioning by the prosecutor in order to contextualize defense counsel's failure to object to Mosely's testimony, *id.*, 11-12. However, the PCRA brief fails to give the **full** context or argue that the six murders are but **one example** of improper references to

assistance, excusing default of the broader "ineffective litigation" claim.

Here, Petitioner will lay out trial counsel's ineffective litigation of each reference noted in the *Petition*. Then, he will respond to the Commonwealth's merits arguments.[4]

---

extraneous violence which trial counsel ineffectively litigated.

Perhaps, the lack of context and narrowness of the PCRA claim arise from an effort to shorten the brief. During direct appeal, when Petitioner was also represented by post-conviction counsel Gelman, the trial court dismissed all of the claims in Petitioner's *Statement of Issues Complained of on Appeal* (a "*1925(b) Statement*") because it was too long (16 pages) and contained an "outrageous" number of issues (nine). *See TCO-Direct*, 5-6. This resulted in waiver of all but one of Petitioner's direct-appeal claims. *Bey-1*, at 4-5.

[4]Petitioner will not respond to the Commonwealth's lengthy "Factual Background" section, *CR* 21-31, which section's purpose seems arguing (1) that Thompkins did tell law enforcement that he was afraid for his life, *id.*, 23-24; and (2) that Petitioner was the source of this fear, *id.*, 27-28, n.15. Whether Thompkins actually had fear is irrelevant to the issue of whether trial counsel ineffectively litigated admission of extraneous-violence references. Moreover, not even the prosecutor sought to prove that Petitioner was connected to neighborhood violence. *See* NT 12/13/05, 48.

The Commonwealth now compounds the error committed by the trial prosecutor – injecting rumors of gang violence into the case in an effort to prejudice Petitioner. Perhaps the best example of this injection of extraneous violence into its *Response*, is footnote 15, which goes even further than the trial prosecutor in trying to defend Petitioner's conviction based on a series of unrelated and entirely irrelevant acts of violence.  *CR* 27-28.  Such arguments had no place at trial, and certainly have no place in these proceedings.

8

### A.    Trial Counsel Ineffectively Litigated Admission of Extraneous Violence References

#### 1.    Ineffectiveness During the Motion *in Limine*

The Commonwealth notes that trial counsel moved *in limine* to bar Thompkins from testifying about threats and fear – arguing that this motion shows "[t]he trial court and both sides plainly recognized that this evidence was admissible" because, after oral argument, both parties agreed that the prosecutor could elicit testimony about Thompkins' fear if the trial court instructed the jury that the fear was not connected to Petitioner. *CR*, 36-37.

However, this motion *in limine* shows no such thing.  Rather, it demonstrates ineffective assistance of counsel. Trial counsel moved to exclude references to threats and Thompkins' fear which he admitted he had learned about through the prosecutor's notes provided to him that day which he had not fully read when making the motion. NT 12/13/05 45-46, 47-48. Trial counsel argued that such references were "extraordinarily prejudicial." *Id.*, 48. The prosecutor responded at length, concluding, "Your Honor, it's admissible. You give a limiting instruction to the jury, and I will agree there is no evidence that connects Saleem Bey to what Mr. Thompkins fears in his mind. That's not why I'm seeking to admit it, but I'm seeking to admit it to explain his course of conduct and his state of mind." *Id.*, 50. Instead of waiting for

9

the trial court to rule on his argument that the evidence was overly prejudicial – or supplementing his argument, or seeking to clarify the extent to which the prosecutor would be allowed to inquire in this minimally relevant, tangential matter – trial counsel agreed to admit the testimony. *Id.* He did so without knowing the full scope of extraneous-violence references, as he had not read the prosecutor's notes, which themselves did not encompass all of the prosecutor's later questioning of Thompkins. The trial court never said a word about this part of the motion nor did it deliver any stipulation or limiting instruction about the extraneous violence evidence.[5]

### 2.     Ineffectiveness During Testimony and Argument

Direct examination of Thompkins came just after the motion *in limine*. The prosecutor repeatedly elicited that Thompkins did not want to be in court. NT 12/13/05, 65, 72, 81. Trial counsel did not object, although he later objected to a question about whether Thompkins was intimidated by people in the audience. *Id.*, 89-90. Similarly, trial counsel did not object to a string of questions asking Thompkins about various statements of fear of being killed that he allegedly made to the prosecutor. *Id.*, 77-79. He did object to some of this line of questioning, *id.*, 80-

---

[5]The Commonwealth responds to the absence of a stipulation or limiting instruction by arguing that it was unnecessary in the first place and also speculating that perhaps it was given but mistakenly not transcribed. *CR*, 37.  Absent proof that the instruction was given but not transcribed, this Court must find that it was not given.

83, suggesting that his earlier failure to object was not based on an agreement with the prosecutor during the motion *in limine*. Moreover, trial counsel did not request the agreed-upon stipulation either before of during this questioning.

Trial counsel did not object to extraneous-violence evidence elicited during Detective Mosely's testimony, which was not confined to the comment about six other murders and which Mosely admitted was not in the statement she took from Thompkins. NT 12/13/05, 180-83. Similarly, trial counsel did not object to Detective Boyle's testimony that Thompkins told him, off the record, that the police could not protect him and his family. *Id.* at 151.

Trial counsel also did not object to testimony about victim Swanson's artifact wounds, which suggested that he was involved in gang violence. NT 12/13/05, 232; NT 12/14/05, 16-19. Similarly, trial counsel himself elicited testimony that victim-witness Thompkins was incarcerated on a "gun case," NT 12/13/05, 128, a fact upon which the prosecutor seized during re-direct examination, *id.*,136.

Finally, during cross-examination of Detective Boyle, the detective non-responsively answered trial counsel's question about whether Thompkins provided a possible motive to law enforcement, "Mr. Thompkins didn't directly come out and tell us there was a motive, but Detective Mangold and myself knew the motive." *Id.* at 158-59. Trial counsel failed to move to strike this testimony, instead content to

11

banter with Boyle, seemingly bolstering him, "Oh, well, I know you guys are that smart. That's not what I asked." *Id.* at 159.[6]

Trial counsel did not object to the prosecution's closing argument, which referred pervasively to Thompkins' fear and did so for purposes far beyond explaining why Thompkins gave statements to defense counsel. *See Petition*, 21-22 & n.18. This failure to object was not due to a tactical concern to be "polite," as trial counsel repeatedly interrupted the prosecutor's closing argument on other issues. NT 12/14/05, 168, 176, 177, 190, 192, 193, 220, 223, 225, 232, 236.

Overall, trial counsel's litigation of the critical extraneous-violence-evidence issue was nonchalant and *ad hoc*. He made a motion *in limine* without preparation, argued it incompletely, did not allow the judge to decide it, and agreed to a stipulation which was then never given. He objected to some extraneous-violence references but not the most egregious ones, despite often garnering sustained objections when he did object. Trial counsel never moved for a mistrial based on a pattern of prosecutorial

---

[6]During re-direct examination, the prosecutor tried to expand upon Boyle's secret motive testimony by asking him about a special homicide detail he was on and about whether there was a motive regardless of whether Thompkins provided one. NT 12/13/05, 170, 174. Trial counsel objected to both questions, and the objections were sustained. *Id.*, 170-74. This part of trial counsel's response to the "secret motive" testimony cannot be deemed ineffective. However, it is cited in the *Petition* as evidence of the overall emphasis on extraneous violence at trial and trial counsel's inconsistent litigation of exclusion of such references.

misconduct nor did he object to the prosecutor using the extraneous-violence evidence in his closing argument as a major trial theme and to prove motive.

### B.     The Commonwealth's Arguments

Petitioner will respond to the following arguments, beyond procedural default, which he can discern from the Commonwealth's brief. *CR*, 34-38, 80-82.

1.     The Commonwealth asserts that none of the references noted in the *Petition* – aside from Mosely's testimony about six other murders – are relevant to the claim of ineffective assistance of trial counsel.  *CR*, 81. As shown above, this is not so.

2.     The Commonwealth further argues that "prosecutor Gilson did not, even remotely, attempt to use [extraneous-violence] evidence to show petitioner's guilt." *CR*, 35, 81. However, prosecutor Gilson suggested neighborhood or gang violence as a motive for the shooting:

> But there's another motive here and I've touched upon it. Saleem Bey, South Philly; Terry Swanson, South Philly; Kenny Thompkins, South Philly; the gun, South Philly. And they all knew each other. Terry Swanson has been shot before. This is a neighborhood thing. It's a South Philly thing. Unfinished business.

NT 12/14/05, 218.

The evidence of this "neighborhood thing" is found in the prosecutor's repeated references to extraneous violence: Kenneth Thompkins' fear, the victims'

prior involvement with guns, the police's understanding of a "secret motive." The prosecution could not have argued neighborhood violence as a motive simply because all the case participants were from South Philadelphia, an area with a population in the tens to hundreds of thousands. Instead, improper extraneous-violence evidence was elicited – mostly under the guise of explaining Thompkins' reason for speaking with defense counsel – and left for the jury to connect to the proposed gang-violence motive.

**3.**    The Commonwealth asserts that Petitioner has raised a state-law issue, the admissibility of the extraneous-violence evidence, which is not reviewable in federal court. *CR*, 34-36. However, the instant claim presents a federal-law issue – ineffective assistance of counsel.

To show deficient performance, Petitioner identified the bases on which trial counsel could have objected, *Petition*, 17-23, and noted that the trial court repeatedly sustained objections to exclude extraneous-violence evidence, such that further objection to the prosecutor's ignoring such rulings would have been sustained, *id.*, 23-25. Assuming, *arguendo*, that the extraneous violence evidence would have withstood hearsay and prejudice objections and that the court would have allowed the prosecutor to use the evidence in an anticipatory manner, trial counsel was ineffective for not seeking to **limit** the quantity of such evidence, which came to dominate the

14

trial despite its minimal relevance.[7]

On the ineffective assistance of counsel claim, the state court unreasonably held that because it could identify a theory of admissibility (*i.e.* relevance) for the extraneous-violence evidence, any objection to such evidence was meritless.[8] As noted previously, the court mistook relevance as a condition sufficient for admitting evidence when, in reality, it is a condition necessary but not sufficient. *Petition*, 16.

---

[7]For instance, trial counsel should have moved to limit the prosecutor to asking Thompkins briefly whether he was afraid to testify and, if Thompkins denied fear, impeaching him with the contents of his signed police statement. Even this testimony should have been accompanied, contemporaneously, with a clear limiting instruction. If the court was unwilling to do so, trial counsel could balance the value of introducing Thompkins' statements to prior defense counsel with the admission of wide-ranging prejudicial hearsay about Thompkins' fear and other extraneous violence.

Trial counsel did none of this. Instead – as explained above – he made a half-hearted motion *in limine* not fully knowing what evidence the prosecutor intended to introduce and did not even wait for the trial court to rule upon the motion, agreeing with the prosecutor to a cautionary instruction or stipulation which the trial court never provided.

[8]In fairness to the Superior Court, PCRA counsel phrased the claim as ineffectiveness for failure to object to evidence "which was not admissible under any theory," *PCRA Brief*, at 9, rather than evidence which should have been excluded or limited regardless of whether it was minimally relevant under some theory. This invited the Court to reject the PCRA claim by identifying any theory of relevance for the extraneous evidence, thereby ignoring other necessary admissibility considerations (*i.e.* hearsay, prejudice). Regardless of PCRA counsel's ineffective presentation of the claim, the Superior Court's analysis of an objection's merit should have addressed more than the evidence's relevance.

The state court has not fully ruled on the state-law issue – admissibility – but only a subset of that issue – relevance. [9] As such, its holding, ostensibly about the evidence's "admissibility" is not entitled to deference in assessing the far more comprehensive claim of ineffective assistance of counsel presented here.

**4.**     Finally, the Commonwealth asserts that Petitioner raises a challenge to the sufficiency of the evidence. *CR*, 82 (*citing Petition*, 32-43). Petitioner has noted instances of evidentiary weakness not to challenge the sufficiency of the evidence but rather to show that the alleged errors had a significant impact on the verdict and that the state courts unreasonably concluded that the evidence was "overwhelming."

---

[9]The cases which the Commonwealth cites to argue that state-court determinations of state law are binding on the federal courts are inapposite as they consider instances in which the state court has considered the entire state-law question. *See, e.g.*, *CR*, 35 (*citing Priester v. Vaughn*, 382 F.3d 394, 402 (3d Cir. 2004) (holding that the state PCRA court reasonably relied on previous state-court decisions approving of an accomplice liability instruction to address petitioner's claim that the instruction given in his case did not convey state-law requirements).

## GROUND II

### THE IDENTIFICATION INSTRUCTIONS

Petitioner has identified two significant flaws in the *Kloiber* jury instruction on eyewitness identification: (1) the instruction lacked the proper presumption that the jury "must view [the testimony] with caution" and all of the appropriate factors that could give rise to such a presumption, *Pet.*, Ground II § A; and (2) it created an improper mandatory presumption that the jury "may not" view the identification testimony with caution, *Pet.*, Ground II § B.

The Commonwealth argues at length that the accuracy of Officer Taylor's identification testimony was not in doubt, so no *Kloiber* instruction was needed in the first place. *CR*, 38-41. This argument does not respond to the issue posed in the *Petition*: given that the trial court felt that a *Kloiber* instruction was appropriate and gave such an instruction, trial counsel was ineffective for failing to correct its glaring deficiencies.[10]

The state courts have not engaged with the *Kloiber* instruction deficiencies noted by Petitioner.  PCRA counsel Gelman challenged the instruction on three

---

[10] In the post-AEDPA world of deference to state-court judgments, it is odd that the Commonwealth challenges the state-court finding that the identification was sufficiently suspect to require a *Kloiber* instruction. Petitioner stands by his argument that Talyor's identification was, in fact, in doubt.  *See Pet.*, 34-39.

fronts: (1) not telling jurors that if they found a factor impinging upon the identification's accuracy then it "must be received with caution," thereby omitting language from *Kloiber*, *PCRA Petition* at 25; (2) placing a burden on the defendant to prove such factors, *id.* at 30-31; and (3) telling jurors that if they found no such factors then the identification "may be treated as a statement of fact," language from *Kloiber* which Gelman argued does not belong in a jury instruction because it creates an improper presumption, *id.*, 26-30.[11]

The Court of Common Pleas addressed only the last argument, reasoning that the "statement of fact" language in a jury instruction had been upheld by Pennsylvania appellate courts. *TCO-PCRA*, 11-12 (*citing Commonwealth v. Trivigno*, 750 A.2d 243, 253 (Pa. 2000)). The Superior Court endorsed the Court of Common Pleas' reasoning. *Bey-2*, 7.

Thus, the state court did not decide the claim of error in replacing the proper instruction "[where an accuracy-impinging factor is found] the testimony as to identity **must be received with caution**" with the weaker and confusingly circular "if you believe a witness is not in a position to clearly observe and was not in a position because of lighting and/or conditions, then you may use that as a factor in

---

[11]Ground II in the *Petition* raises Gelman's first claim and a stronger version of the third.

determining whether or not that person actually had the opportunity to observe."

Petitioner adds to this part of PCRA counsel's claim that "lighting and/or conditions" was not the only factor the trial court should have listed: "qualifications, hedging, or **inconsistencies** in the rest of his testimony," "bad position," and "other reasons" also applied. These factors come from the model instruction. Pa. Sugg. Std. Crim. Jury Instr. § 4.07B; *see also Petition*, 47-48, n. 32.  PCRA counsel ineffectively failed to argue that trial counsel was ineffective for not asking the trial court to list all appropriate factors.

Whereas the state courts ignored this error, the Commonwealth replies only that "[t]here is no reasonable probability of a different outcome had the court used the word 'caution' in this jury charge . . . . because there was no weak identification evidence here." *CR*, 43. This response ignores the argument that the instruction given omitted a key presumption (the identification "**must be** reviewed with caution") and merely reiterates the above position that even if the instruction was deficient it was unnecessary in the first place.[12]

---

[12]For the rest of its response to this claim, the Commonwealth argues (1) there is no prejudice because the overall evidence in the case was strong, *CR*, 43; (2) that there is no federal question because the state court determined that the jury instructions were not erroneous, *id.*, 43-45; and (3) that trial counsel strategically chose not to object to the defective instruction because then "the court might have recognized that a *Kloiber* instruction was not required at all in this case." *Id.*, 45-46. Petitioner (1) stands by his explanation of the evidentiary weakness, *Petition*, 32-43;

The Commonwealth has not addressed the second overall error in the *Kloiber* instruction raised in the *Petition*, Ground II § B: that it created an unconstitutional mandatory presumption that if the officer was "positive and unqualified" in his identification then the jury "may not" receive it with caution. As the accuracy of Taylor's identification testimony was a key trial issue, counsel was ineffective for failing to object to this mandatory presumption which deviates significantly from the model instruction and *Kloiber*, and which violated due process of law. *Pet.*, 50-52. Post-conviction counsel was ineffective for noting only the "statement of fact" language as creating an unconstitutional presumption, not the much more egregious, due-process-violating, "may not" language in the sentence before.

Prejudice is heightened by the fact that the officer's identification of Petitioner was a contested issue at trial.

---

(2) asserts a federal constitutional question of ineffective assistance of counsel in failure to seek a proper instruction and object to an unconstitutional presumption, *see Petition*, 49, 50-52; and (3) argues that there can be no strategy in sanctioning a defective instruction on the grounds that it is better than no instruction at all (particularly where the defective instruction is more harmful than no instruction at all).

## GROUND III

### THE *BATSON* VIOLATION

The Commonwealth first argues that Petitioner did not show a *prima facie* case of discrimination in juror selection. However, the Commonwealth acknowledges United States Supreme Court precedent holding that when the prosecutor gives reasons for striking jurors, the "*prima facie* case" issue becomes moot and a reviewing court should proceed to consider whether the reasons given were pretextual. *CR*, 49, n.17 (*citing Hernandez v. New York*, 500 U.S. 352, 359 (1991)).

In the instant case, the *prima facie* question is moot because the trial court **asked** for the prosecutor's reasons – NT 12/6/05, 114; NT 12/7/05, 29.  The trial court thus implicitly found a *prima facie* case.[13] Establishing a *prima facie* case is not "onerous" and requires only "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson v. California*, 545 U.S. 162, 170 (2005).[14]

---

[13] *See also TCO-Direct* at 7 ("On two occasions, this Court found a *prima facie* case of discrimination and required the prosecutor to explain his reason for striking those jurors.").

[14] In any event, seven of nine strikes (a rate of 78%) certainly establishes a *prima facie* case.  *See Holloway v. Horn*, 355 F.3d 707, 722 (3d Cir. 2004) ("The most striking factor in this case is the prosecutor's pattern of strikes. Holloway moved for a mistrial after the prosecutor had used seven of eight peremptory strikes against African-Americans").

Next, the Commonwealth employs a multi-pronged approach to argue that the prosecutor's reasons were not pretextual.  **First**, the Commonwealth argues, without citing authority, that it is improper for this Court to consider juror comparisons.[15] This ignores authority approving of a reviewing court's comparison of jurors stricken and not stricken by the prosecutor. *See Petition* at 55 (*citing Miller-El v. Dretke*, 545 U.S. 231, 241 (2005); *Snyder v. Louisiana*, 552 U.S. 472, 483-84 (2008)). Moreover, the record does not show the trial court using juror comparisons to evaluate the prosecutor's reasons, so there is nothing for this Court to defer to in considering the comparisons offered by Petitioner. The Commonwealth's rule would hold that whenever the trial court rules on reasons offered by the trial court, a reviewing court may not re-evaluate the issue of pretext. This would effectively foreclose all habeas claims of a *Batson* violation.

**Second**, the Commonwealth argues that no venireperson was similarly situated to those challenged, because the prosecutor relied upon a "combination" of reasons to strike them. *CR*, 58. Petitioner challenges each reason given by the prosecutor. If none are at all plausible, it is unlikely any are plausible in combination. To sanction

---

[15] *See CR*, 57 ("Petitioner simply invites the court to engage in a *de novo* re-evaluation of credibility based upon comparisons of what he alleges were similarly situated jurors accepted by the prosecutor. But this is exactly what he cannot do."); *id.* at 58 ("This is utterly inappropriate, since the question was settled by the trial judge on the sound basis of live credibility.").

the Commonwealth's "combination" argument would be to invite prosecutors to give two or three pretextual reasons, hoping to provide enough reasons to avoid any perfect comparisons.

**Third**, the Commonwealth notes that each of the comparable venirepersons whom the prosecutor did not strike had characteristics "attractive to the prosecution" which thus differentiated them from the venirepersons noted by Petitioner. *CR*, 59, n. 20; *see also id.* at 59-62, nn. 20-24. Many of these "prosecution friendly" characteristics do not distinguish the venirepersons noted by Petitioner. The Commonwealth notes "prosecution friendly" factors including having a brother-in-law employed in law enforcement, witnessing a crime, assisting the police or prosecution in investigating/prosecuting a crime, lengthy employment in the same place, and working in banks. *Id.*[16] Venirepersons noted by Petitioner also had such "prosecution friendly" characteristics. *See* NT 12/6/05 108-09, 113 (Venireperson Allen) (noting that she had a degree in library science, had worked in the same place for fourteen years, was the victim of a home invasion, and had a best friend whose husband was a police officer); NT 12/7/05 21-23, 26 (Venireperson Green) (noting

---

[16]Some "prosecution friendly" factors are unabashedly improper. *See, e.g.*, *CR*, 60, n. 22 ("Mark Strohecker [was] a **white** male with one child, age 1. He had grown up near the scene of Petitioner's crime at the time of the crime, and **had heard about it.**").

that she worked as a bank teller, witnessed a friend get shot within four feet of her [possibly with the motive of robbery], assisted police in the investigation by providing an interview, and that her boyfriend's father was a policeman). The Commonwealth's attempts to distinguish strikes of Venirepersons Allen and Green are further pretext.

**Fourth**, with respect to Venireperson Green, the Commonwealth gives specific reasons why the prosecutor's South-Philadelphia-residence and pregnancy reasons were not pretextual. On the pregnancy reason, the Commonwealth misstates several facts. Green was not in her "ninth month of pregnancy," *CR*, 62, but rather had six weeks before her due date, NT 12/7/05, 27. Green did not "initially answer that she did **not** think she could sit on a jury [due to her pregnancy]," *CR*, 63, rather she answered, ambiguously, "no" and clarified that she meant "[no,] I don't think it will be a problem," NT 12/7/05, 28. The Commonwealth argues that regardless of how Green assessed her own physical state, the prosecutor was justified (and acting race neutrally) in excusing her due to pregnancy. *CR*, 66. However, the prosecutor seemingly credited Green's assessment of her own physical status, focusing his argument not on her giving birth or having other complications during trial but on her inability to come to court in potentially hazardous winter conditions. NT 12/7/05, 30-

31.[17] This pretextual reason applied equally to any number of elderly jurors not stricken by the prosecutor. Regarding the South Philadelphia reason, the trial court did not accept it. *Id.*, 34. As such, it cannot be a race-neutral reason justifying the prosecutor's strike. The Commonwealth argues that the reason is still evidence of the prosecutor's non-racist intent, *i.e.* to respond to a "very real stop-snitching culture that was part of the context of this trial." *CR*, 64-65 & n.25. Petitioner has noted how neighborhood may be a surrogate for race and how prosecutors in the Philadelphia District Attorney's office were instructed to use neighborhood as a surrogate for race.

**GROUND IV**

**THE *DOYLE-CARTER* VIOLATIONS**

**A.   Merits**

The Commonwealth argues that Petitioner has raised two claims under Claim IV. While it is true that comment on a defendant's in-trial silence (Part 2) directly violates the Fifth Amendment's "self-incrimination" clause,[18] while comment on a defendant's pre-trial, post-arrest silence (Part 1) is a Due Process violation of the defendant's fair reliance on *Miranda* warnings (which, in turn, implement the Fifth

---

[17] Earlier in the prosecutor's *voir dire* examination of Green, he stated, "You know your condition better than anyone else." NT 12/7/05, 28.

[18] *Carter v. Kentucky*, 450 U.S. 288 (1981).

Amendment)[19] – Petitioner grouped these errors together as both are improper comments on his silence. In any event, the prejudicial effects of claims for relief are considered cumulatively,[20] so there is no practical difference whether they are considered together or as separate claims.

Both *Doyle* and *Carter* provide clearly established United States Supreme Court law for purposes of 28 U.S.C. § 2254(d). The Commonwealth characterizes Part 1 as a claim under *Virgin Islands v. Davis*, 561 F.3d 159 (3d Cir. 2009). *CR*, 84. However, *Davis* illustrates a *Doyle* violation to compare with the instant case,[21] and as the Court of Appeals has held, such comparisons are useful, even under AEDPA:

> The District Court also held that *Moore* was not "clearly established Federal law determined by the Supreme Court" for purposes of AEDPA because it was decided by a lower federal court and was decided after the Superior Court's judgment. This analysis is wrong. Glenn does not argue that the Superior Court unreasonably applied *Moore* itself, but that *Moore*, **as factually analogous precedent**, is evidence that the Superior Court unreasonably applied Supreme Court precedent concerning broader principles of due process. *See Matteo v. Superintendent, SCI Albion,* 171 F.3d 877, 890 (3d Cir.1999) (en banc) ("[W]e do not believe federal habeas courts are precluded from considering the decisions of inferior federal courts when evaluating whether the state court's

---

[19] *Doyle v. Ohio*, 426 U.S. 610 (1976).

[20] *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007).

[21] *See Davis*, 561 F.3d at 164 ("The record shows that the prosecutor attempted to elicit the precise inferences that the [Government] is prohibited from exploiting under **Doyle**.").

application of the law was reasonable.... **[I]n certain cases it may be appropriate to consider [these decisions] as helpful amplifications of Supreme Court precedent**.")

*Glenn v. Wynder*, 743 F.3d 402, 408, n.6 (3d Cir. 2014).  Comparing the prosecutors' comments in *Davis* and the instant case – *see Pet.*, 64-65 –  shows a *Doyle* violation in the summation which trial counsel failed to raise in an objection.[22]

The Commonwealth also argues that the prosecutor's comments on Petitioner's pre- and in-trial silence were "fair response" to the defense closing argument. This is incorrect. Petitioner's trial counsel argued that the statements Thompkins gave to prior defense counsel were true and complete while his statements to police were untrue and/or incomplete. NT 12/14/05, 140-41. He presented extended argument on why this was so,[23] none of which invited the prosecutor to comment on Petitioner's

---

[22]The Commonwealth incorrectly distinguishes *Davis* as "a case explicitly about questioning a defendant **on the stand** regarding whether **he** had given a statement to police." *Response* at 85. *Davis* did concern the prosecutor's improper **closing argument** which "highlight[ed] the fact that [the defendant] had not **advanced his exculpatory version of the shooting to the police** from the time he was arrested to the time of trial." 561 F.3d at 164. Thus, *Davis* is entirely analogous.

[23]Trial counsel argued that during Thompkins' first statement to police he was "drugged up" and in pain at the ICU, and thus just said "I don't know what happened." NT 12/14/05 140-41. Trial counsel then argued that there was no evidence of coercion in Thompkins' statements to defense counsel, they contained reliable details, and Thompkins provided a believable reason for why he went to talk to the defense on his own. By contrast, his second statement to police was given in custody after being seized by police in court. *Id.* at 142-54.

27

pre-trial silence as a means of rebutting them. *Compare Doyle*, 426 U.S. at 617-18 ("Noting that the prosecution usually has little else with which to counter such an exculpatory story, the State seeks only the right to cross-examine a defendant as to post-arrest silence for the limited purpose of impeachment. . . . Despite the importance of cross-examination, we have concluded that the *Miranda* decision compels rejection of the State's position."). Although Petitioner's decision not to disclose the exculpatory Thompkins statements was an argument the prosecutor had to discredit such evidence, such an argument was nonetheless improper.

Regarding the comments on Petitioner's **in-court** silence, the Commonwealth argues that the prosecutor was not asking Petitioner for answers but rather "role-playing" what defense counsel would have asked Petitioner at a hypothetical pre-trial meeting. *CR*, 88. Even accepting such a creative reading of the trial transcript,[24] the prosecutor cannot attack the defendant's failure to explain himself by putting the attack, rhetorically, into defense counsel's mouth. Indeed, if a prosecutor could cloak a Fifth Amendment violation in such a way, there would be nothing left of this constitutional protection.

The Commonwealth also argues that this role-playing was part of a larger

---

[24] There is no indication in the record that the prosecutor shifted from speaking about Petitioner and defense counsel in the third person to speaking as them in the first person.

response to defense counsel's "speculation about why Petitioner fled." *Id.* However, the role-playing added nothing to the prosecutor's response to the defense theory that Petitioner ran from police because he had an unregistered weapon on him. This response came later. *See* NT 12/14/05, 207. While the "role playing" may have been an oratorical lead-up to the response, it remains an obvious attack on Petitioner's decision not to testify: directly addressing Petitioner, asking him to explain his conduct, and noting that the jury would be interested in his response.

**B.    Procedural Default**

**1.    Comment on Post-Arrest Silence (*Doyle*)**

Trial counsel was ineffective for his failure to raise a *Doyle* violation in the prosecutor's comment on Petitioner's failure to disclose exculpatory evidence before trial. *See Pet.*, 66-67. As noted, although trial counsel objected to the prosecutor's comment on Petitioner's failure to disclose this evidence, he argued that state discovery rules did not require disclosure. He failed to argue that the comment violated Due Process and *Doyle*. This latter objection was a meritorious one. Under the trial court's understanding, the former objection was not.[25] Trial counsel's ineffective failure to realize the *Doyle* violation and initial post-conviction counsel's

---

[25]The trial court had already stated that if prior defense counsel told the witness Thompkins that his statements would be given to police, then the prosecutor could comment on Petitioner's failure to disclose them. *See Pet.*, 64-65 & n.48.

failure to raise this ineffectiveness claim provides an exception to procedural default of the claim under *Martinez*. The Commonwealth has offered nothing to refute that either lawyer was deficient for failing to raise this obvious basis for objection, nor shown that this failure was not prejudicial.

### 2.    Comment on Silence at Trial (*Carter*)

Trial counsel did not object to violation of the defendant's Fifth Amendment right not to testify: the prosecutor's closing argument directly addressing the defendant, asking him to explain his conduct on the night of the shooting, and noting that the answers are "something that the jury is going to want to know." NT 12/14/05 206-07. Initial post-conviction counsel likewise failed to raise this claim of ineffectiveness, thus providing cause for the default of this claim under *Martinez*.

### GROUND V

### TRIAL, DIRECT APPEAL AND PCRA COUNSEL INEFFECTIVELY FAILED TO OBJECT TO THE COURT'S INCOMPLETE INSTRUCTION ON PETITIONER'S RIGHT TO REMAIN SILENT

### A.    Merits

Petitioner has pled that the no adverse inference instruction's incompleteness permitted the jury to draws adverse inferences that did not necessarily rise to the level of guilt, but which nonetheless harmed the defense case. *Pet.*, 68-71.

The Commonwealth contends that "all that is required" from a no-adverse

30

inference instruction, is that the jurors be instructed that they are to draw "no inference of guilt" from the defendant's decision not to testify, rather than to draw "no adverse inference" at all. *CR*, 89. The Commonwealth characterizes all inferences adverse to the defendant as inferences of guilt. To the Commonwealth, the model instruction's phrase "any other inference adverse to the defendant" refers only to a potential jury presumption that the defendant did not testify because he was "ignorant, or illiterate." *Id*.

The Commonwealth is mistaken. First, the jury's excusing a failure to testify because of intellectual disability is not adverse to the defendant.  Second, and more importantly, not all adverse inferences are inferences of guilt. An inference of guilt is a presumption that because innocent person would likely testify, the defendant is guilty **because** he did not testify. Conversely, an "other adverse inference" is one not making the defendant guilty by itself but contributing to the conviction.

The United States Supreme Court and the Pennsylvania model instruction recognize the difference between an inference of guilt and an adverse inference. *Carter v. Kentucky*, 450 U.S. 288, 297 (1981), affirmatively answered the question of "whether it is a violation of the Fifth and Fourteenth Amendments to invite a jury in a state criminal trial to draw an **unfavorable** inference from a defendant's failure to testify."  The Court held that the trial court must, upon request, give an instruction

31

which will "minimize the danger that the jury will give **evidentiary weight** to a defendant's failure to testify." *Id.* at 305. The Court recognized that evidentiary weight may include inferences that do not by themselves rise to the level of guilt. *Id.* at 296-97 (*citing Griffin v California*, 380 U.S. 609, 610 (1965) (overturing a conviction after the jury was instructed that the defendant's failure to testify does not set up a presumption of guilt but may set up lesser presumptions, such as the truth of the prosecution's evidence or that "those [inferences] unfavorable to the defendant are more probable")). Indeed, the jury instruction which *Carter* held must be delivered read, "the fact that [the defendant] does not [testfiy] cannot be used as an inference of guilt **and should not prejudice him in any way**." *Id.* at 289.

Likewise, the Pennsylvania model instruction requires that the jury "must not draw any inference of guilt, **or any other inference adverse to the defendant**," and the Advisory Committee Note remarks, "This instruction is grounded in the accused's right to self incrimination under the Fifth Amendment to the U.S. Constitution [under] *Carter* . . . ."

To explain the importance of the "no adverse inference" instruction's missing phrase, Petitioner gave examples of inferences which could have been drawn adversely to him without by themselves compelling a guilty verdict. *Pet.*, 70, n. 49.

These examples involved circumstantial-evidence inferences,[26] for example that any fear witness Thompkins expressed showed that Petitioner coerced Thompkins' exculpatory statements.[27]  The *Petition* could also have mentioned the adverse inference noted in *Griffin*, that the jury could give more credibility to Commonwealth witnesses, contrasting their decision to testify with Petitioner's decision not to do so.

### B.    Procedural Default

The "no adverse inference" instruction has been standard and constitutionally required since *Carter* in 1981. Trial counsel was ineffective for failing to object to an instruction not conveying that the jury must avoid any presumptions at all arising from Petitioner's decision not to testify.  Similarly, post-conviction counsel could have no legitimate reason for not raising this error.  Thus, procedural default of this claim is overcome.

---

[26]The Commonwealth misread the *Petition* as raising an ineffectiveness claim based on failure to seek an instruction that the jury was "not [to] draw any adverse inference from circumstantial evidence of guilt." *CR*, 89. No such claim was raised.

[27]Petitioner's decision not to testify could have influenced the jury to draw this inference, reasoning that had Petitioner not threatened Thompkins, he would have taken the stand to say so.

### GROUND VI

### THE TRIAL COURT ERRED IN PROVIDING A REASONABLE-DOUBT INSTRUCTION SUGGESTING TO JURORS THAT THEY COULD IGNORE DOUBTS CAUSING HESITATION IN MATTERS OF THE HIGHEST IMPORTANCE

The Commonwealth mischaracterizes the argument made by PCRA counsel and in the *Petition*. The error in the reasonable doubt instruction is not that the "refrain from acting" standard is unconstitutionally high – *see CR*, 68, 91-92 – but rather that it is **higher** than the "pause/hesitate" standard.[28] Thus, when the two standards are presented in the alternative, the jury may choose to select one standard and ignore the other, thereby ignoring doubts which cause them to merely pause or hesitate – a level of doubt which the Supreme Court has long endorsed as the benchmark for reasonable doubt.[29]

The Commonwealth reiterates the PCRA court's reason for dismissing the claim, that other Pennsylvania courts have upheld the exact same language. *CR*,68. However, the opinions cited by the PCRA court fail to consider that presenting the "refrain" standard disjunctively with the "pause/hestitate" standard may pose the

---

[28]*See, e.g.*, *Thomas v. Horn*, 570 F.3d 105, 118 (3d Cir. 2009) ("Comparing the 'hesitate to act' instruction with the 'restrain from acting' formulation, we are inclined to agree with Thomas that the latter places a lower burden of proof on the prosecution.").

[29] *Id.* (*citing Victor v. Nebraska*, 511 U.S. 1, 20 (1994)).

above-noted problem, instead reasoning that a jury presented with both standards in the disjunctive will always consider both. *See Commonwealth v. Uderra*, 862 A.2d 74, 92 (Pa. 2004); *Commonwealth v. Trippett*, 932 A.2d 188, 200 (Pa. Super. Ct. 2007) (*citing Uderra*); *Commonewalth v. Romero*, 938 A.2d 362, 380 (Pa. 2007).

Petitioner's argument has not been addressed on the merits by the PCRA courts or by the *Commonwealth's Response*. This Court must determine whether there is a reasonable probability that defining a reasonable doubt as one causing jurors to "pause, hesitate, or refrain" could cause a juror to perceive a license to select the refrain standard and ignore doubts causing mere pause or hesitation.

## GROUND VII

### PROSECUTORIAL VOUCHING AND MISSTATEMENT OF EVIDENCE

### A.    Merits

A defendant should be tried on the evidence in the case, not the evidence as compared to the prosecutor's experience in other cases. *See, e.g.*, *United States v. Costa*, 553 F. App'x 227, 232-33 (3d Cir. 2014); *United States v. Lee*, 612 F.3d 170, 195 (3d Cir. 2010). Vouching and misstatements were made worse by the lack of an instruction that closing arguments are not evidence.[30] Petitioner responds to only

---

[30] Before closing arguments, the jury was told, "You are not **bound** by the evidence that is disclosed or argued by the Commonwealth or defense counsel. You must rely on your own recollection of the evidence." NT 12/14/05, 74; *see also*

35

those merits arguments raised in the *Commonwealth's Response*, noting that the Commonwealth did not respond to each instance of vouching and misstatement of evidence noted in the *Petition*.

1.　　The Commonwealth argues that because "[i]t is common knowledge and common sense . . . that most criminals do not commit their crimes . . . in front of a watching police officer," *CR*, 93, the prosecutor did not add evidence into the record when he testified about how many murder cases there are in Philadelphia each year, how few of those cases have police eyewitnesses, and how few cases in his own 18 years of experience have had a police eyewitness (one). The precise frequency of police eyewitnesses is not common knowledge. Regardless, such frequency was irrelevant to assessing the evidence and was only introduced to bolster the Commonwealth's case by characterizing it as "one in a million." NT 12/14/05, 163.

2.　　The Commonwealth argues that each way in which the prosecutor suggested police witnesses were better than civilian witnesses was a reasonable inference from the evidence. *CR*, 93. Petitioner disagrees and notes, for example, that

---

*Petition*, at 85, n.61 (noting instances in the prosecutor's summation when jurors were told that their own recollection controlled). This instruction did not convey that the prosecutor's vouching was not itself evidence. The trial court's pre-deliberations instructions also merely reminded jurors that their recollection of the facts controlled. NT 12/15/05, 3-4. Before trial, the court told the jury that opening statements are merely an outline, not evidence, NT 12/9/05, 5; but shortly thereafter, the court did not say the same about closing statements, *id.* at 6.

the Commonwealth has not defended the prosecutor's comment about the "sad fact of life" that civilian witnesses **do not care** about crimes not concerning them, NT 12/14/05, 163-64, which is inconsistent with the prosecutor's equally unsupported comment that "unlike most civilian witnesses, [police are] completely objective and completely **impartial**," *id.*, 169.

The prosecutor's personal opinions on police and civilian witnesses' characteristics – coming with the imprimatur of the his office, which regularly interacts with police and civilian witnesses – was not remedied by telling jurors "I am not asking you, believe you me, I am not asking you to just believe me because they're cops. I'm not." C*R*, 93. One can say one thing and, by one's conduct, suggest something entirely different. Moreover, the prosecutor may have meant exactly what he said: he was not asking the jury to believe the police witnesses "just . . . because they're cops" but because of his own testimony about law enforcement.

**3.**     The Commonwealth argues that the prosecutor's comments on money was "pure reference to evidence." *CR*, 94-95. The prosecutor did not merely argue that because the two victims had large amounts of money on them, the motive could have been robbery. Rather, he told jurors – again, with his office's imprimatur – the **frequency** of robbery as the motive in murder cases. The more frequently that robbery is the motive for murder, the less likely it was that the Commonwealth had

37

not proven the motive, which absence of motive the jury was instructed that it may consider, NT 12/15/05, 26-27.

**4.**     The Commonwealth argues that the prosecutor did not tell jurors that gunshot-residue contamination affirmatively existed (as an excuse for why no test was performed) and that one could only arrive at such a conclusion by "quibbling over prosecutor Gilson's phrasing." *CR*, 95-96. Petitioner stands by the argument raised in his *Petition*, at 82, and directs the Court to NT 4/14/05, 221-23.

**5.**     The Commonwealth argues that the prosecutor did not elide inconsistencies in the testimony about whom Officer Taylor saw get shot, reasoning that "if [the prosecutor] somehow once or twice confused which victim was shot in the head, and which in the upper neck, both from behind, that is forgiveable." *CR*, 96. The prosecutor was not confused. First, he inaccurately stated that both victims "were shot in the back of the head **area**." NT 12/14/05, 193. Soon thereafter, gaining confidence that his elision went unnoticed, he argued that they were "both shot in the back of the head. . . . [b]oth of them." *Id.,* 196. This was not honest confusion but rather an attempt to minimize a key inconsistency – explained in the *Petition* at 36-37, 83 – by misstating the record.[31]

_____

[31]The Commonwealth argues that another misstatement noted in the *Petition* is merely a misreading by Petitioner, explaining that the prosecutor's statement "[Taylor] told them I saw that man with a gun shoot another man in the parking lot

## B.      Procedural Default

Trial counsel objected to the prosecutor adding to or misstating the record during closing argument. However, he did not object consistently, did not object to the instances raised in the *Petition*, and did not move for a mistrial after a pattern of vouching and misstatement depriving Petitioner of a fair trial. Failure to do so was ineffective since Petitioner has a meritorious claim of prosecutorial misconduct based on vouching and misstatement in the prosecutor's summation. Initial post-conviction counsel did not raise trial counsel's ineffective handling of this meritorious issue, and his ineffectiveness excuses default of the claim under *Martinez*.

### GROUND VIII

#### INEFFECTIVE ARGUMENT THAT PETITIONER POSSESSED A WEAPON

Petitioner and the Commonwealth agree this claim was defaulted when PCRA counsel, Norris Gelman, failed to raise it in the appeal of the PCRA. The Commonwealth argues such omission was not ineffective assistance of post-conviction counsel – excusing procedural default under *Martinez* – because Gelman engaged in "effective appellate lawyering" by "winnow[ing] a weak claim." *CR*, at

---

in the back. That's a fact. There was a man shot in that parking lot in the back," could refer to a man being shot in the **back parking lot** rather than being shot in the back in the parking lot. Petitioner concedes this as a viable reading of the prosecutor's statement, which was nonetheless confusing.

96-97. It was ineffective to "winnow" this claim if it had merit. This Court should assess the merits of the claim, as presented in the *Petition,* at 88-89.

## GROUND IX

### TRIAL COURT MISSTATEMENT AND DISTORTION OF EVIDENCE

**A.    Merits**

The Commonwealth argues there was no error in the trial court *sua sponte* telling jurors that police officers did nothing wrong and "used their discretion" in arresting Thompkins on a bench warrant but not bringing him before the court – reasoning that the trial court's statement "did not in any way misstate the evidence." *CR*, 98.  However, the court's error was not misstating whether officers should have been sanctioned for violating the bench warrant's terms. Rather, the error was adding this personal view, which distorted the trial evidence. *See Pet.*, 90. Detective Boyle's cross-examination testimony was evidence that law enforcement was willing to violate the letter of the law, which evidence supported an inference that other irregularities were due to shoddy investigation. Whether the trial court would have sanctioned such a violation was irrelevant to this inference. The prosecutor could rebut the inference by testimony or argument that the letter of the law was not violated. Perhaps, even, defense counsel and the prosecutor could argue at sidebar whether the letter of the law was violated, and the trial court could then present a

40

stipulation to the jury. However, the trial court erred by telling jurors that the violation was not major and that he trusted the detective's discretion. This added evidence lessened the inference of police misconduct and bolstered police witnesses' credibility.[32]

Regarding a separate but related instance of trial-court bias, the Commonwealth argues that Petitioner "is absolutely wrong in saying that the court told jurors that there was a gunshot residue test performed on petitioner that came back negative" but, in the same paragraph, concedes that "[t]he court may have mis-stated at one point of its summary of what the detective was saying." *CR*, at 98.[33] In arguing that the court's misstatement – which again bolstered the police investigation – did not affect the trial, the Commonwealth notes repeated testimony that no gunshot-residue test was performed, such that the trial court's comment could not have confused the jury on this point. However, as this is a claim of trial court bias and ineffective

---

[32]As noted in the *Petition*, at 92, bolstering police witness' credibility was particularly prejudicial as only direct evidence of the shooter's identity was a police eyewitness (and the circumstantial evidence was meaningless if the identification was wrong).

[33]While the Commonwealth concedes the possibility that the court told jurors that a test was run and came back negative ("there **was** nothing found here") it argues that more likely there was a "mis-transcription" and the court really said "there **would have been** nothing found here." *CR*, 98. The Commonwealth's resort to speculation in transcription errors to excuse flaws in this trial is unavailing.

assistance of counsel in failing to object to it, the issue is not whether the jury thought that a gunshot residue test was performed but the effect of the trial court's misstatement on the jury. Intentional or not, the trial court's misstatement showed nonchalance in presuming police competence, suggesting to the jury that the gunshot-residue testing issues was so insignificant that it did not merit careful attention or summary. *See Petition*, at 90 (*quoting Quercia*, 289 U.S. 466, 470 (1933) ("the trial judge['s] . . . lightest word or intimating is received with deference, and may prove controlling.")).

### B.    Procedural Default

Trial counsel failed to object or move for a mistrial based on the court's *sua sponte* statement that any law enforcement error in handling the Thompkins bench warrant was minor. Instead, trial counsel merely bantered with the judge about whether the error was minor or not.[34] This was ineffective because the court's

---

[34] *See* NT 12/13/05, 168:

THE COURT: (. . .) I would not hold [the detective] in contempt for not [bringing Thompkins before the court after arresting him on the warrant] because the witness is here today and that's all I wanted. Go ahead.

MR. McMAHON: He is only here today because he is in jail.

THE COURT: Of course he is.

MR. McMAHON: But contempt is contempt. All right. Fine.

comment violated Petitioner's right to a fair trial by adding evidence and bolstering Commonwealth witnesses.

Trial counsel also ineffectively failed to object to the court's misstatement that police had tested Petitioner for gunshot-residue.

Initial post-conviction counsel ineffectively failed to raise these related claims of trial-counsel ineffectiveness, which excuses default under *Martinez*.

## GROUND X

### INEFFECTIVE INVESTIGATION AND PREPARATION OF CHARACTER WITNESSES

### A.    Merits

There is no dispute that (1) Petitioner's character witnesses were effectively attacked on their inability to recall a single specific conversation they had about Petitioner's character for nonviolence, and (2) whether they had such conversations (and the substance of such conversations) was the only question trial counsel asked character witnesses.

The Commonwealth disputes that the witnesses' inability to recall specific conversations was caused by ineffective investigation and preparation of trial counsel. **First**, the Commonwealth argues for a creative interpretation of trial counsel directly telling the court that he started investigating character witnesses on the eve of the

43

trial's last day or later. *CR*, 99. This reading is unlikely and contradicted by the plain language of trial counsel's statement. *See Petition*, at 94 (*quoting* NT 12/14/05, 33).

**Second**, the Commonwealth argues that trial counsel waited until the eve of the trial's last day to propose calling character witnesses because he wanted to avoid the prosecution investigating "rebuttal testimony about petitioner's bad reputation for violence on the street." *CR*, at 100. However, the error is not delay in notifying the court about character witnesses but rather delay in investigating and preparing them – shown by trial counsel's statement to the court and the witnesses' inability to effectively answer the one question posed to them. **Finally**, the Commonwealth argues that trial counsel did prepare the character witnesses to name specific conversations they had about Petitioner's non-violence but that when the witnesses took the stand they refused to do so because "[g]iving names, a form of snitching, is highly dangerous in this City, even to character witnesses." *CR*, at 100. It seems unlikely that naming friends and family who had said Petitioner was non-violent would expose character witnesses to physical harm. Even so, if the witnesses were unwilling to do so, trial counsel was ineffective for failing to discover this in advance and not call them. The character witnesses' failure to answer trial counsel's one question produced the exact opposite effect as intended.

The Commonwealth asserts that if there was deficient investigation and

44

preparation of character witnesses, "there can have been no possible *Strickland* prejudice." *Id.* This assertion fails to address the importance of character evidence. *Petition*, at 94-95.

**B.    Procedural Default**

Trial counsel ineffectively investigated and prepared character witnesses, and initial post-conviction counsel's ineffectiveness in failing to raise this claim excuses default under *Martinez*.

## CONCLUSION

Despite the Commonwealth's current attempts to blame non-existent transcription errors, criticize the *Petition*'s organization, and resort to the same improper appeals to street violence that was done at trial, Petitioner's trial was far from fair.  It was imbued by violations of Due Process and ineffective assistance of counsel.  All of the claims are properly before the Court.  Even those not presented by state post-conviction counsel are reviewable under *Martinez*.

Accordingly, for all of the above reasons and those contained in the *Petition*, and based upon the entire record of this case, the Court should grant the writ of habeas corpus.

Respectfully Submitted,

/s/ Michael Wiseman

Law Office of Michael Wiseman
Michael Wiseman
Benjamin Marshal
Post Office Box 120
Swarthmore, Pennsylvania 19081
215-450-0903
Wiseman_Law@Comcast.Net
Counsel for Petitioner

Dated:        August 7, 2014
              Swarthmore, PA

**Certificate of Service**

I, Michael Wiseman, hereby certify that on this 7th day of August, 2014, I served a copy of the foregoing upon the following person by filing the same with this Court's ECF Filing system:

ADA John Goldsborough
Office of the Philadelphia District Attorney

/s/ Michael Wiseman

Michael Wiseman